# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **Claudia C. Hoerig,** | **Case No. 4:22-cv-00300** |
| **Petitioner,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| | **Magistrate Judge Carmen E. Henderson** |
| **Warden Shelbie Smith,** | |
| **Respondent** | **MEMORANDUM OPINION AND ORDER** |

This matter is before the Court upon the Report & Recommendation ("R&R") of Magistrate Judge Carmen E. Henderson (Doc. No. 70), which recommends that the Petition of Writ of Habeas Corpus filed by Petitioner Claudia C. Hoerig ("Hoerig") pursuant to 28 U.S.C. § 2254 be dismissed. Hoerig has filed Objections to the R&R. (Doc. No. 82.)

For the following reasons, Hoerig's Objections (Doc. No. 82) are OVERRULED and the Magistrate Judge's R&R (Doc. No. 70) is ACCEPTED as set forth herein.

## I.     Summary of Facts

Hoerig challenges the constitutionality of her conviction and sentence for aggravated murder of her husband, Karl Hoerig ("Karl"), in the case of *State v. Hoerig*, Trumbull County Court of Common Pleas, Case No. 2007 CR 00269. The state appellate court summarized the facts underlying Hoerig's conviction as follows:[1]

{¶21} . . . [Hoerig] learned that she was pregnant for the third time on March 9 (Friday), 2007. She knew that [Karl] wanted to divorce, but she decided that she would try to save the marriage and, if that failed, she would kill herself. On that day she made

---

[1] The facts as presented in the "last reasoned state-court opinion" are "presumed to be correct" and can only be rebutted by "clear and convincing evidence." *Gibbs v. Huss*, 12 F.4th 544, 546 (6th Cir. 2021). *See also* 28 U.S.C. § 2254(e)(1).

arrangements to have $9,900, the balance of her personal savings, wired to her father in Brazil. She did not want [Karl] to have the money if she killed herself.

{¶22} [Karl] was out of town on the weekend of March 10 to 11. [Hoerig] searched the internet for information about killing oneself with a gun.

{¶23} On March 10, [Hoerig] purchased the .357 Magnum, the laser grip, and ammunition and took the gun to a firing range for practice. [Hoerig] explained that, based on what she had learned from the internet, she was concerned about recoil and how that could affect her aim. She did not want to maim herself and survive the suicide attempt. She practiced with a laser sight to see what effect recoil was having on her accuracy. After practicing, she purchased additional ammunition at Gander Mountain.

{¶24} That weekend she built a gun mount in the closet of the upstairs bedroom because she continued to be concerned about recoil. She set the mount at the height her head would be at if she were sitting on a chair in front of the closet. She also drafted a letter pleading with [Karl] not to leave her which she sent to him as well as a few of his friends.

{¶25} [Karl] returned home on the morning of March 12, 2007. [Hoerig] confronted him with the pregnancy and they began to argue. The argument became heated and they began to struggle. Then [Karl] stopped fighting and went to take a shower. [Hoerig] started drinking and continued until she was intoxicated.

{¶26} When [Karl] finished showering (after about an hour), [Hoerig] stood before him with the .357 Magnum pointed at her head. She wanted his attention and to impress upon him that she was both serious about having the baby and desperate to save their relationship. [Karl] stared at her for about ten seconds, then grabbed her and threw her to the floor. He told her "that was a good idea" but she should wait for him to leave the house and do it in the basement so she would not splatter blood on his paintings.

{¶27} [Hoerig] testified she became very angry and described thus what happened next:

> I thought to myself, well, that's it. There's no more talking. I'm gonna kill myself. But you know what? If I'm gonna die, * * * he's gonna get his wish. This child is gonna die. The three of us are gonna die here right now. So I just — when he started going down the steps, I just got up real fast and positioned myself behind him and I shot the first time, and he died instantly. * * * And he just fell. * * * The position that he fell on the floor, he never moved from that position.

[Hoerig] believed that she "shot three times" and "hit him three times, saving two bullets for herself." She fired the second and third shots "next to him downstairs." She

did not realize that she had fired five shots. She then went upstairs to the bedroom with the suicide mount to kill herself but the gun did not fire. She reloaded it.

{¶28} At this point, [Hoerig] hesitated and decided to call her family in Brazil to say goodbye. They urged her not to kill herself but to return to Brazil instead. [Hoerig] decided to flee. She went to the bank where she kept her passport in a safe deposit box and withdrew some money from a checking account and then proceeded to the airport in Pittsburgh.

*State v. Hoerig*, 2020 WL 1685624, at *3 (Ohio App. 11th Dist. Apr. 6, 2020).  In addition to Hoerig's

own testimony, the state appellate court summarized the testimony of the State's witnesses as follows:

{¶4} Krista Bridges, a friend of [Karl], testified that, in August 2006, she was at a bachelorette party at which [Hoerig] was also present. While talking about [Karl], she heard [Hoerig] comment that, "if he ever leaves me, I'd kill him."

{¶5} Donald Schrecengost testified that, in February 2007, he arranged with [Karl] to rent a house on West Broad Street in Newton Falls. Schrecengost received a deposit from [Karl] and gave him the house key.

{¶6} Daniel Henry, a friend of [Karl], testified that, in February 2007, [Karl] confided that his marriage with [Hoerig] was failing and that they were going to divorce. [Karl] showed Henry the house on Broad Street where he intended to live after they separated.

{¶7} Brian Martin testified that, on March 10 (Saturday), 2007, he was an employee of Slugmasters gun shop in Leavittsburg. On that date, he sold [Hoerig] a Smith & Wesson .357 Magnum Revolver, Crimson Trace Laser Grip (which he installed for her), and .38 and .357 hollow point ammunition. According to Martin, [Hoerig] claimed she wanted a firearm for home protection, asked several questions, and made notes of their conversation in a concealed carry handbook.

{¶8} Richard Sliter, Jr. testified that, on March 10, 2007, he was an employee of the JCL Shooting Range in Warren. On that date, [Hoerig] used the range to practice firing a .357 Magnum with laser sights.

{¶9} Harry Dodge, a friend of [Karl], testified that he was aware [Karl] intended to leave [Hoerig] and had invited him to stay at his home. They were members of 910th Airlift Wing based at Youngstown-Warren Air Reserve Station. On the morning of March 15 (Thursday), 2007, Dodge learned that [Karl] had failed to report at the base the previous evening. Dodge contacted the police to request a welfare check on [Karl].

{¶10} Ron Lane, formerly with the Newton Falls Police Department, testified that, on March 15, 2007, he was dispatched to a residence at 64 West Ninth Street in Newton

3

Falls to perform a welfare check. Lane discovered [Karl's] body at the bottom of a flight of stairs.

{¶11} Pete Pizzulo, formerly a sergeant in the detective bureau of the Trumbull County Sheriff's Department, conducted an investigation of the killing. Pizzulo testified that, based on the odor and other indicators, [Karl] had been dead for a few days. His body was face-down and covered with a comforter and tarp. He had been shot three times. Two other shots had been fired, striking the floor near the body and continuing into the basement. There was a water bottle and a pair of shoes near the body.

{¶12} In an upstairs bedroom, Pizzulo found a bottle of alcohol on the bed. In the bedroom closet, a two by four had been screwed to the wall and a hole drilled in the middle of the board. The muzzle of a .357 Magnum, loaded and cocked, was inserted into the hole and aiming into the bedroom.

{¶13} Pizzulo attempted to contact [Hoerig] by phone without success. A BMW belonging to the couple was found at the Pittsburgh airport and it was learned that [Hoerig] had flown from Pittsburg[h] to New York and thence to her native Brazil.

{¶14} Andrew Chappell, a forensic scientist in the firearms section of the Ohio Bureau of Criminal Investigation, testified that the bullet fragments and cartridges recovered from the scene were .38 caliber hollow points fired from the .357 Magnum found in the bedroom.

{¶15} Christopher Jester, a Trooper in the Ohio State Highway Patrol's Crash and Crime Scene Reconstruction Unit, testified that, based on the trajectory of the two bullets striking the floor, the shooter would likely have fired from the landing at the top of the steps or from the first and second step at the bottom of the staircase.

{¶16} Joseph Felo, a forensic pathologist and chief deputy medical examiner for Cuyahoga County Medical Examiner's Office, testified regarding the three gunshot wounds. Wound A was a nonfatal, penetrating gunshot wound caused by a bullet entering [Karl's] right upper back and travelling through the body at a steep upwards angle before shattering the right shoulder. Wound B was a fatal, penetrating gunshot wound where the bullet entered [Karl's] back closer to the neck and spine than the bullet that caused wound A. The bullet traveled downward and to the left piercing a lung and his aorta before ending behind the left nipple. Wound C was a fatal, perforating gunshot wound in which the bullet entered the right side of his head, exited the left side, and lodged in the floor underneath the head.

{¶17} Dr. Felo opined that wound A was caused first, possibly while [Karl] was bent over at the bottom of the stairs tying a shoe. Wound B was caused after [Karl] had fallen to the floor which prevented the bullet from exiting the body. Dr. Felo could not estimate the distance at which the bullets were fired causing wounds A and B. The

4

bullet that caused wound C was fired from a distance of 12 to 24 inches based on the presence of stipple wounds. Dr. Felo noted that there were no signs of bruises or lacerations on the body such as would indicate that [Karl] had fallen down the stairs.

{¶18} Anthony Sano, an agent with the Federal Bureau of Investigation, testified that, on January 17, 2018, he escorted [Hoerig] on a flight from Brazil to the Akron-Canton Airport. During the flight, [Hoerig] admitted killing [Karl] but remarked that "a wife doesn't kill her husband without having a good reason."

{¶19} Mike Yannucci, a sergeant with the Trumbull County Sheriff's Office, interviewed [Hoerig] upon her return to Ohio on January 17, 2018. A video recording of the interview was played for the jury.

{¶20} In the video, [Hoerig] stated she met [Karl] online and they dated for about two months before marrying in June 2005. According to [Hoerig], the marriage was volatile. She suffered two miscarriages and went into depression and claimed that [Karl] was also depressed. By 2007, she had become suicidal. After a confrontation with [Karl] on the morning of March 12, 2007, she shot and killed him.

*Id.* at *1–2.

## II.  Procedural History

### A.  State Court Proceedings

#### 1.  Trial Court Proceedings

On April 24, 2007, a Trumbull County Grand Jury indicted Hoerig on one count of aggravated murder for "purposely, and with prior calculation and design, caus[ing] the death of Karl Hoerig" in violation of Ohio Revised Code §§ 2903.01(A) & (F), which count included a three-year firearm specification under Ohio Revised Code § 2941.145.  (Doc. No. 30-1, Ex. 1 at PageID#s 1205–07.) On April 24, 2007, an arrest warrant was issued upon Hoerig's indictment.  (*Id.*, Ex. 2 at PageID# 1211.)  On April 20, 2016, Hoerig was arrested in Brazil for extradition to the United States.  (*Id.*, Ex. 10 at PageID# 1439.)  Hoerig was later extradited to the United States and was arrested in Trumbull County, Ohio, on January 17, 2018.  (*Id.* at PageID# 1438.)

On February 1, 2018, the State filed a motion to determine speedy trial calculation and trial date.  (*Id.*, Ex. 6 at PageID# 1228.)  Hoerig, through trial counsel, filed a combined response to the State's motion and motion to dismiss for lack of a speedy trial on February 16, 2018.  (*Id.*, Ex. 7 at PageID# 1233.)  The state filed an answer to Hoerig's motion to dismiss on March 13, 2018, and Hoerig filed a supplemental brief in support of her motion to dismiss on March 20, 2018.  (*Id.*, Exs. 8, 9.)  On March 22, 2018, the trial court concluded that Hoerig's speedy trial rights had not been violated and denied her motion to dismiss.  (*Id.*, Ex. 10.)  Hoerig signed a written speedy trial waiver on March 15, 2018, which continued the trial date to September 17, 2018.  (*Id.*, Ex. 11.)  Hoerig executed another written speedy trial waiver on September 6, 2018, which continued her trial date to January 14, 2019.  (*Id.*, Ex. 12.)

On April 16, 2018, Hoerig filed a motion to suppress evidence seized as a result of searches of her home and automobiles.  (Doc. No. 30-1, Ex. 13.)  The trial court held a hearing on Hoerig's motion to suppress on May 4 and May 5, 2018.  (*Id.*, Ex. 20.)  The parties then submitted proposed findings of fact and conclusions of law.  (*Id.*, Exs. 14, 15.)  After they were filed, the trial court required the parties to submit supplemental briefing.  (*Id.* Ex. 16.)  Following the parties' submission of supplemental briefing, the trial court held an additional hearing on Hoerig's motion to suppress on August 9, 2018.  (*Id.*, Exs. 17, 18, 19, 20.)  On August 16, 2018, the trial court denied Hoerig's motion to suppress.  (*Id.*, Ex. 20.)

On April 19, 2018, Hoerig filed a motion to change venue "to ensure that [Hoerig] receives a fair trial before a jury untainted by pre-trial publicity."  (*Id.*, Ex. 22 at PageID# 1529.)  The trial court denied Hoerig's motion to change venue on January 15, 2019.  (*Id.*, Ex. 23.)

6

Hoerig's case proceeded to trial on January 14, 2019, and on January 24, 2019, the jury found Hoerig guilty of aggravated murder and the firearm specification. (*Id.*, Ex. 24.) Following a sentencing hearing, on February 8, 2019, Hoerig was sentenced to life imprisonment without the eligibility of parole for twenty-five years, plus three years imprisonment on the firearm specification to "be served prior to and consecutive to the underlying charge for a total imprisonment term prior to parole eligibility of twenty-eight full years." (*Id.*, Ex. 26.)

### 2. Direct Appeal

Hoerig, through new counsel, challenged her conviction and sentence on direct appeal. (*Id.*, Ex. 27.) Hoerig raised the following five grounds for relief:

I. The jury's finding that appellant had committed [the] crime of aggravated murder was not supported by sufficient evidence.

II. Appellant[']s conviction is against the manifest weight of the evidence.

III. The trial court erred and abused [its] discretion by repeatedly permitting the state to make arguments during opening statements.

IV. The trial court erred and abused its discretion by making a series of evidentiary rulings, over the objection of Appellant's trial counsel, which caused Appellant to suffer prejudice in the proceedings.

V. The cumulative effect of various errors occurring in the trial of the case at bar served to deprive Appellant of her right to a fair trial.

(*Id.* at PageID#s 1574–76.) On April 6, 2020, the state appellate court affirmed Hoerig's conviction and sentence. *See State v. Hoerig*, 2020 WL 1685624 (Ohio App. 8th Dist. Apr. 6, 2020)

On December 17, 2020, after obtaining leave to file a delayed appeal, Hoerig, acting *pro se*, filed a memorandum in support of jurisdiction with the Supreme Court of Ohio. (Doc. No. 30-1 at Exs. 34, 35.) In her memorandum in support of jurisdiction, Hoerig raised the following five propositions of law:

7

    I.       Whether the trial court erred and abused its discretion to the prejudice of the defendant in denying her Crim. R. 29(A) motion for acquittal before closing arguments because the State failed to present sufficient evidence of premeditation and prior calculation and design to support a conviction of aggravated murder beyond a reasonable doubt, in violation of defendant's due process rights under the Fourteenth Amendment to the United States Constitution, thereby mandating a reversal.

    II.      Whether the conviction of Claudia Hoerig is against the manifest weight of the evidence.

    III.    Whether the trial court erred and abused [its] discretion by repeatedly permitting the State to make arguments during opening statements.

    IV.    Whether the trial court erred and abused its discretion by making a series of evidentiary rulings, over the objection of Appellant's trial counsel, which caused Appellant to suffer prejudice in the proceedings.

    V.      Whether the cumulative effect of various errors occurring in the trial of the case at bar served to deprive Appellant of her right to a fair trial.

(Doc. No. 30-1, Ex. 35.)  On March 2, 2021, the Supreme Court of Ohio declined to accept jurisdiction of Hoerig's appeal pursuant to Ohio Supreme Court Rule of Practice 7.08(B)(4).  (*Id.*, Ex. 37.)  *See also State v. Hoerig*, 163 N.E.3d 593 (Ohio 2021) (Table); S. Ct. Prac. R. 7.08(B)(4).  Hoerig did not file a petition for a writ of certiorari in the Supreme Court of the United States before her deadline to do so expired on May 31, 2021.  *See* Sup. Ct. R. 13.

### 3.      Rule 26(B) Application to Reopen

On October 28, 2020, Hoerig, acting *pro se*, filed an application to reopen her direct appeal pursuant to Ohio Rule of Appellate Procedure 26(B).  (Doc. No. 30-1, Ex. 38.)  In her Rule 26(B) application, Hoerig asserted that her direct appeal should be reopened because her appellate counsel was ineffective for failing to raise the following seven assignments of error in her direct appeal:

    1.      Claudia Hoerig was denied her rights of due process and assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Article 1, Section[s] 10 and 16 of the Ohio Constitution

because her trial counsel and her appellate counsel provided ineffective assistance.

2. The trial court erred and abused its discretion by denying Claudia's 02-16-18 and 03-20-18 motions to dismiss due to speedy trial violation pursuant to [O.]R.C[.] 2945, without a hearing in its journal entry dated 03-22-2018 and shifted the burden of proof to the defendant, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Section 10 of the Ohio Constitution. This is a[l]so [a] violation of due process because Claudia was not given a chance to defend against the accusations of the State.

3. The trial court erred and abused its discretion by denying Claudia's motion for a change of venue without a hearing and took nine months to rule on the motion in violation of due process. Trial court violated due process because the court release[d] a film of her confession to police and it was repeatedly broadcasted on television and also [the] prosecutor hired CBS news to air a story on her case twice before her trial and also for 12 years used the local newspaper which had her as their top 3 story every year. Her story saturated the community for 12 years and prejudice resulted from disruptive influences in the courtroom. It was massive, pervasive and prejudicial and it took the jury less than one hour to come up with [a] verdict, they didn't even watch her 3-hour DVD deposition. She has a difficult to understand foreign accent which would require to watch at[] least once while deli[b]erating.

4. The prosecutor engaged in misconduct to violate the treaty between the United States and Brazil. The trial court erred and abused its discretion by not addressing the issue raise[d] in her pro se motion and her habeas corpus that the prosecutor had produced false affidavits and employed the media for 12 years, and political help, used federal public money to bribe the Brazilian Government to violate the Treaty of Extradition between the United States and Brazil, without due diligence, violat[ing] Claudia's constitutional rights from 12 years to be tried and Brazil, pe[]r Articles V, VII, XI of the Treaty.

5. Prosecutorial misconduct resulted in an unfair trial – the prosecution failed to correct knowingly false testimony in violation of her due process rights as found in the Fourteenth Amendment[] to the United States Constitution. Counsel failed to challenge false testimony. Prejudice resulted. There was and Sections 10 and 16, Article 1 of the Ohio Constitution.

6. The prosecution failed to disclose exculpatory evidence to Appell[ant] in violation of her due process rights as found in the Fourteenth Amendment[] to the United States Constitution and Sections 10 and 16, Article 1 of the Ohio Constitution.

7.    The trial court excessive bail journal entry violated Hoerig's due process clause of the Fourteenth Amendment, and the excessive fines clause of the Eighth Amendment to the United States Constitution and Section 9, Article 1 of the Ohio Constitution.

(*Id.* at PageID#s 1771–75.)  On December 22, 2020, the state appellate court denied Hoerig's Rule 26(B) application.  (*Id.*, Ex. 41.)  On February 1, 2021, Hoerig, acting *pro se*, filed a memorandum in support of jurisdiction with the Supreme Court of Ohio concerning the denial of her Rule 26(B) application, setting forth the following seven propositions of law:

1.    WHETHER Claudia was denied her Sixth Amendment Right to Assistance of Counsel; and her Fourteenth Amendment Right to DUE PROCESS as guaranteed by the United States Constitution and by the Article 1 of Section[s] 10 and 16 of the Ohio Constitution, WHEN her trial counsel and appellate counsel provided ineffective assistance.

2.    WHETHER trial court erred and abused its discretion in violation of the SPEEDY TRIAL Clause and the DUE PROCESS Clause as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution Article 1 of Section 10 of the Ohio Constitution WHEN it denied Claudia's 02-16-2018 and 03-20-2018 MOTIONS TO DISMISS DUE TO SPEEDY TRIAL VIOLATION pursuant to O.R.C. 2945.71 without a hearing in its journal entry 03-22-2018 and shifted the burden of proof to the Defendant, and denying Claudia the DUE PROCESS opportunity to defend against the accusations of the State.

3.    WHETHER trial court erred and abused its discretion in violation of DUE PROCESS CLAUSE and the CONFRONTATION CLAUSE as guaranteed by the Fourteenth and Sixth Amendments of the United States Constitution Article 1 Section[s] 10 and 16 of the Ohio Constitution WHEN it denied Claudia's MOTION FOR A CHANGE OF VENUE without a hearing, WHEN it took nine months to rule on the motion; WHEN it released to the media a film of her misconstrued confession to the police which was repeatedly broadcasted on television; WHEN prosecutor hired CBS Network to air a story on her case twice before her trial; WHEN prosecutor used the local newspaper which had Claudia as their "TOP-3-STORY OF THE YEAR"; WHEN her story saturated the community for 12 years and prejudice[] resulted from disruptive influences in the courtroom; WHEN publicity was invasive, persuasive and prejudicial; and WHEN it took the jury only one hour to come up with a verdict, indicating that the jury didn't even watch her 3-hour-DVD

10

deposition; WHEN Claudia has a difficult to understand foreign accent which would require the jury to watch her DVD at least once while deliberating.

4.      WHETHER the prosecutor engaged in misconduct (malfeasance) to violate the Extradition Treaty between Brazil and the United States, and WHETHER the trial court erred and abused its discretion WHEN it did not address these issues which were raised in her pretrial pro se motion and in her Habeas Corpus claiming that the prosecutor had engaged in pretrial malfeasance producing false affidavits, employing the media for 12 years, using political help, using public money to bribe the Brazilian Attorney General to violate the Treaty of Extradition, not exercising Due Diligence and violating Claudia's constitutional Rights for 12 years to be tried in Brazil per Articles V, VII and XI of the Treaty.

5.      WHETHER Claudia was denied her right to a FAIR TRIAL and DUE PROCESS as found in the Fourteenth Amendment to the United States Constitution and in Article 1 of Sections 10 and 16 of the Ohio Constitution, WHEN prosecutor engaged [in] misconduct and failed to correct knowingly false testimony; and WHETHER Claudia was denied her right to have effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution, and Article 1 of Sections 10 and 16 of the Ohio Constitution, WHEN her trial counsel failed to challenge prejudicial false testimony.

6.      WHETHER Claudia was denied her Fourteenth Amendment Right to a FAIR TRIAL and her right to DUE PROCESS; and her Sixth Amendment Right to the CONFRONTATION Clause, as found in the United States Constitution and in Article 1 of Sections 10 and 16 of the Ohio Constitution, WHEN prosecutor failed to disclose EXCULPATORY EVIDENCE.

7.      WHETHER Claudia was denied her right to DUE PROCESS as found in the Fourteenth Amendment to the United States Constitution and the EXCESSIVE FINE Clause of the Eighth Amendment to the United States Constitution and Article 1 of the Section 9 of the Ohio Constitution, WHEN the trial court issued a Journal Entry setting excessive bail.

(*Id.*, Ex. 43 at PageID#s 1910–11.)  On April 13, 2021, the Supreme Court of Ohio declined to accept jurisdiction of Hoerig's appeal of the denial of her Rule 26(B) application pursuant to Ohio Supreme Court Rule of Practice 7.08(B)(4).  (*Id.*, Ex. 45.)  *See also State v. Hoerig*, 166 N.E.3d 17 (Ohio 2021)

(Table); S. Ct. Prac. R. 7.08(B)(4). Hoerig did not file a petition for a writ of certiorari in the Supreme Court of the United States before her deadline to do so expired on July 12, 2021. *See* Sup. Ct. R. 13.

### B. Federal Habeas Proceedings

On February 18, 2022, Hoerig filed a *pro se* Petition for Writ of Habeas Corpus, with an accompanying Draft Memorandum in Support of her Petition.[2] (Doc. Nos. 1, 14, 14-1.) Hoerig asserts the following twelve grounds for relief:

**Ground 1 – Insufficiency of Evidence**
**Supporting Facts**: THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION TO THE PREJUDICE OF THE DEFENDANT IN DENYING HER CRIM.R 29(A) MOTION FOR ACQUITTAL BEFORE CLOSING ARGUMENTS BECAUSE THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE OF PREMEDITATION AND PRIOR CALCULATION AND DESIGN TO SUPPORT A CONVICTION OF AGGRAVATE[D] MURDER BEYOND A REASONABLE DOUBT, IN VIOLATION OF DEFENDANT'S DUE PROCESS RIGHTS UNDER THE SIXTH, FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, THEREBY MANDATING TO VACATE SENTENCE.

**Ground 2 – Due Process / Manifest Weight of Evidence**
**Supporting Facts:** THE CONVICTION OF CLAUDIA HOERIG IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, DEPRIVING CLAUDIA OF HER RIGHT TO A FAIR TRIAL AND DUE PROCESS IN VIOLATION OF HER RIGHTS TO DUE PROCESS UNDER THE SIXTH, FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

**Ground 3 – Due Process / Trial Court Abuse of Discretion**
**Supporting Facts:** THE TRIAL COURT ERRED AND ABUSED [ITS] DISCRETION BY REPEATEDLY PERMITTING THE STATE TO MAKE ARGUMENTS DURING OPENING STATEMENTS, DEPRIVING CLAUDIA OF HER RIGHT TO A FAIR TRIAL AND DUE PROCESS IN VIOLATION OF HER RIGHTS TO DUE PROCESS UNDER THE SIXTH, FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

---

[2] Even though, on February 18, 2022, Hoerig filed a "Draft" Memorandum in Support of her Petition ("Draft Memorandum"), on May 2, 2022, with the Court's leave, Hoerig filed a Revised Memorandum in Support of her Petition ("Revised Memorandum"), which was meant to replace Hoerig's Draft Memorandum. (Non-Document Order, Mar. 18, 2022; Doc. No. 4; Doc. No. 14-1; Doc. No. 14-1 at PageID# 30.) The Court will consider Hoerig's Revised Memorandum throughout this Memorandum Opinion and Order.

**Ground 4 – Due Process / Trial Court Abuse of Discretion / Evidentiary Hearing**
    **Supporting Facts:** THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY MAKING A SERIES OF EVIDENTIARY RULINGS OVER THE OBJECTION OF APPELLANT'S TRIAL COUNSEL, WHICH CAUSED APPELLANT TO SUFFER PREJUDICE IN THE PROCEEDINGS, DEPRIVING CLAUDIA OF HER RIGHT TO A FAIR TRIAL AND DUE PROCESS IN VIOLATION OF HER RIGHTS TO DUE PROCESS UNDER THE SIXTH, FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

**Ground 5 – Due Process / Unfair Trial / Cumulative Effect**
    **Supporting Facts:** THE CUMULATIVE EFFECT OF VARIOUS ERRORS OCCURI[NG] IN THE TRIAL OF THE CASE AT BAR SERVED TO DEPRIVE APPELLANT OF HER RIGHT TO A FAIR TRIAL AND DUE PROCESS IN VIOLATION OF HER RIGHTS TO DUE PROCESS UNDER THE SIXTH, FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

**Ground 6 – Ineffective Assistance of Counsel**
    **Supporting Facts:** CLAUDIA WAS DENIED HER SIXTH AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL, AND HER SIXTH, FIFTH AND FOURTEENTH AMENDMENT RIGHTS TO DUE PROCESS AS GUARANTEED BY THE UNITED STATES CONSTITUTION, WHEN HER TRIAL COUNSEL AND APPELLATE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE.

**Ground 7 – Speedy Trial Violation**
    **Supporting Facts:** TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN VIOLATION OF THE SPEEDY TRIAL CLAUSE AND THE DUE PROCESS CLAUSE AS GUARANTEED BY THE SIXTH, FI[F]TH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN IT DENIED CLAUDIA'S 02-16-2018 AND 03-20-2018 MOTIONS TO DISMISS DUE TO SPEEDY TRIAL VIOLATION PURSUANT TO O.R.C. 2945.71 WITHOUT A HEARING IN ITS JOURNAL ENTRY 03-22-2018 AND SHIFTED THE BURDEN OF PROOF TO THE DEFENDANT, AND DENIED CLAUDIA THE DUE PROCESS OPPORTUNITY TO DEFEND AGAINST THE ACCUSATIONS OF THE STATE.

**Ground 8 – Due Process / Change of Venue Was Warranted**
    **Supporting Facts:** TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN VIOLATION OF DUE PROCESS CLAUSE AND THE CONFRONTATION CLAUSE AS GUARANTEED BY THE FIFTH, FOURTEENTH AND SIXTH AMENDMENT[S] OF THE UNITED STATES CONSTITUTION WHEN IT DENIED CLAUDIA'S MOTION FOR A CHANGE

OF VENUE WITHOUT A HEARING; WHEN IT TOOK NINE MONTHS TO RULE ON THE MOTION; WHEN IT RELEASED TO THE MEDIA A FILM OF HER MISCONSTRUED CONFESSION TO THE POLICE WHICH WAS REPEATEDLY BROADCASTED ON TELEVISION; WHEN PROSECUTOR HIRED CBS TV-NETWORK TO AIR A STORY ON HER CASE TWICE BEFORE HER TRIAL; WHEN PROSECUTOR USED THE LOCAL NEWSPAPER WHICH HAD CLAUDIA AS THEIR "TOP-3-STORY-OF-THE YEAR"; WHEN HER STORY SATURATED THE COMMUNITY FOR 12 YEARS AND PREJUDICE RESULTED FROM DISRUPTIVE INFLUENCES IN THE COURTROOM; WHEN PUBLICITY WAS MASSIVE, PERVASIVE, AND PREJUDICIAL; AND WHEN IT TOOK THE JURY ONLY ONE HOUR TO COME UP WITH A VERDICT, INDICATING THAT THE JURY DIDN'T EVEN WATCH HER 3-HOUR DVD DEPOSITION; WHEN CLAUDIA HAS A DIFFICULT TO UNDERSTAND FOREIGN ACCENT WHICH WOULD REQUIRE THE JURY TO WATCH HER DVD AT LEAST ONCE DURING DELIBERATION.

**Ground 9 – Due Process / Prosecutorial Misconduct & *Napue***
    **Supporting Facts:** CLAUDIA WAS DENIED HER RIGHT TO A FAIR TRIAL AND DUE PROCESS AS FOUND IN THE SIXTH, FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN PROSECUTOR ENGAGED IN MISCONDUCT AND FAILED TO CORRECT KNOWINGLY FALSE TESTIMONY AND WHETHER CLAUDIA WAS DENIED HER RIGHT TO HAVE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN HER TRIAL COUNSEL FAILED TO CHALLENGE PREJUDICIAL FALSE TESTIMONY.

**Ground 10 – Due Process / Prosecutorial Misconduct & *Brady* Violation**
    **Supporting Facts:** CLAUDIA WAS DENIED HER SIXTH, FIFTH AND FOURTEENTH AMENDMENT RIGHTS AND BRADY RIGHTS TO A FAIR TRIAL AND HER RIGHT TO DUE PROCESS; AND HER SIXTH AMENDMENT RIGHT TO THE CONFRONTATION CLAUSE, AS FOUND IN THE UNITED STATES CONSTITUTION WHEN PROSECUTOR FAILED TO DISCLOSE EXCULPATORY EVIDENCE.

**Ground 11 – Due Process / Judic[i]al Misconduct & Excessive Bail**
    **Supporting Facts:** CLAUDIA WAS DENIED HER RIGHT TO DUE PROCESS AS FOUND IN THE SIXTH, FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES, AND THE EXCESSIVE FINE CLAUSE OF THE EIGHTH AMEND[]MENT TO THE UNITED STATES CONSTITUTION, WHEN THE TRIAL COURT ISSUED A JOURNAL ENTRY SETTING AN EXCESSIVE BAIL IN THE AMOUNT OF $10,000,000.00 AND THE DOCKET SHEET SHOWED A DIFFERENT AMOUNT.

14

**Ground 12 – Violation of the Extradition Treaty**
    **Supporting Facts:** THE PROSECUTOR ENGAGED IN MISCONDUCT (MALFEASANCE) TO VIOLATE THE EXTRADITION TREATY BETWEEN BRAZIL AND THE UNITED STATES, AND WHETHER THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT DID NOT ADDRESS THESE ISSUES WHICH WERE RAISED IN HER PRETRIAL PRO SE MOTION AND IN HER HABEAS CORPUS 18 USCS 2241 CLAIMING THAT THE PROSECUTOR HAD ENGAGED IN PRETRIAL MALFEASANCE PRODUCING FALSE AFFIDAVITS, EMPLOYING THE MEDIA FOR 12 YEARS, USING POLITICAL HELP, USING PUBLIC MONEY TO BRIBE THE BRAZILIAN PROSECUTOR TO VIOLATE THE TREATY OF EXTRADITION, NOT EXERCISING DUE DILIGENCE, AND VIOLATING CLAUDIA'S CONSTITUTIONAL RIGHTS FOR 12 YEARS TO BE TRIED IN BRAZIL, PER ARTICLES V, VII, AND XI OF THE TREATY.

(Doc. No. 14-1 at PageID#s 39–41.)

Hoerig also sent to the Youngstown, Ohio, courthouse a box of exhibits (marked A–Z) totaling over 5,000 pages.  (Non-Document Remark, Mar. 10, 2022; Doc. Nos. 11, 12.)  The Magistrate Judge noted that the box of "[v]oluminous exhibits [were] manually filed and maintained in the Clerk's Office."  (Non-Document Remark, Mar. 10, 2022.)  Nevertheless, Hoerig requested that the box of exhibits be scanned in and "file[d] in the Court's ECF system."  (Doc. Nos. 11, 12, 15.)  The Magistrate Judge denied Hoerig's request and explained that the box of "exhibits are part of the record and will remain part of the record despite not being scanned into CM/ECF. Should Respondent need access to the exhibits in order to respond to Petitioner's petition for habeas relief, Respondent may contact the Clerk of Court to arrange access."  (Non-Document Orders, May 27, 2022, and June 30, 2022.)  Despite this explanation, Hoerig began individually mailing the exhibits from the box of

exhibits for filing.[3]  (Doc. Nos. 31–33, 35–46, 48, 50, 52, 54, 60; *see also* Doc. No. 70 at PageID# 9325 n.3.)[4]

Respondent Warden Shelbie Smith ("Respondent") filed a Return of Writ on August 1, 2022. (Doc. No. 30.)  On October 18, 2022, Respondent filed a Reply to Hoerig's Traverse and Supplements thereto.  (Doc. No. 59.)

On February 15, 2023, the Magistrate Judge issued an R&R, recommending that Hoerig's Petition be denied in its entirety, and that the Court not issue a certificate of appealability.  (Doc. No. 70.)[5]

Hoerig, following an extension of the objection deadline,[6] filed Objections to the R&R on April 17, 2023.[7]  (Non-Document Order, Mar. 14, 2023; Doc. No. 82.)  Respondent filed a Response

---

[3] Hoerig also moved to, in relevant part, expand the state court record under Rule 7 of the Rules Governing Section 2254 Cases, which the Magistrate Judge denied.  (Doc. Nos. 34, 58.)

[4] Document Number 60 was stricken upon motion by Respondent.  (Doc. No. 61; Non-Document Order, Nov. 1, 2022.)

[5] On October 3, 2022, Hoerig filed a "Draft" Traverse, along with subsequent "supplements" in support thereof.  (Doc. Nos. 55, 56, 57.)  In her R&R, the Magistrate Judge considered Hoerig's "Draft" Traverse as well as Hoerig's supplements.  (Doc. No. 70 at PageID#s 9309–10.)

[6] In Hoerig's Objections is a request for "leave to file supplemental objections."  (Doc. No. 82 at PageID# 9834.) However, the only reason Hoerig provides in support of this request is that "the law library has been closed most of the time," in part due to the Easter holiday and illness.  (*Id.*)  This request is denied for several reasons.  First, this request is not a proper request, as it is not presented in a motion and is instead embedded in her Objections.  Second, Hoerig does not provide any authority that would require the Court to grant an extension to file supplemental objections on these grounds.  Lastly, despite the R&R being only 50 pages, Hoerig's Objections already amass over 300 pages, so there is little reason why Hoerig would require additional pages to file objections.  (*Id.*)  Thus, Hoerig's reasons for an extension are insufficient to demonstrate good cause to grant leave to file, yet again, briefings supplemental to the Objections she has already filed following a nearly forty-five-day extension.  The Court declines to give Hoerig another opportunity to file supplemental objections.

[7] Hoerig filed several documents titled "Objections" in March 2023 in which Hoerig asserts in large part that she has not received a copy of the R&R and requests that the Court make the R&R available on LexisNexis and extend Hoerig's deadline to file objections to the Magistrate Judge's R&R.  (Doc. Nos. 74, 75, 76, 77.)  None of these "Objections" include any substantive objections but instead and in sum, merely reiterate Hoerig's representation that she did not receive a copy of the R&R.  After the Court re-sent a copy of the R&R to Hoerig, Hoerig filed substantive Objections addressing the R&R on April 17, 2023 ("Hoerig's Objections"), which the Court will consider in this Memorandum Opinion and Order evaluating the R&R.  (Non-Document Order, Mar. 14, 2023.)

16

to Hoerig's Objections on April 28, 2023.[8]  (Doc. No. 83.)  Hoerig filed a Motion for Leave to File

*Instanter* a Reply to Respondent's Response on May 8, 2023, which the Court denied on May 9,

2023.  (Non-Document Order, May 9, 2023.)[9]

## II.    Standard of Review on Objections

Parties must file any objections to a report & recommendation within fourteen days of service.

Fed. R. Civ. P. 72(b)(2).  Failure to object within this time waives a party's right to appeal the district

court's judgment.  *See Thomas v. Arn*, 474 U.S. 140, 145 (1985); *United States v. Walters*, 638 F.2d

947, 949–50 (6th Cir. 1981).

"When a district judge reviews a magistrate judge's resolution of a non-dispositive matter, it

is not a *de novo* review, as it is in relation to a magistrate judge's recommendation as to a dispositive

matter."  *Inhalation Plastics, Inc. v. Medex Cardio-Pulmonary, Inc*., 2013 WL 992125, at *6 (S.D.

Ohio Mar. 13, 2013).  Rather, the Magistrate Judge's decision is subject to review under Rule 72(a)

and reversal when it "is clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A). *See* 237

F.3d at 603; *Alvarado v. Warden, Ohio State Penitentiary*, 2018 WL 5783676 at *1 (N.D. Ohio Nov.

5, 2018); *Phillips v. LaRose*, 2019 WL 5729919 at *2 (N.D. Ohio Nov. 5, 2019).

---

[8] On March 27, 2023, Respondent also filed a Response to Hoerig's "Objection" from March 24, 2023, in which Respondent argues that Hoerig's "Objection" failed to address the Magistrate Judge's R&R and therefore did not present proper objections.  (Doc. Nos. 77, 78.)  However, as noted above, Hoerig's Objection from March 24, 2023, was not an objection, but rather a request for an extension of time to file her Objections, which she did on April 17, 2023.  (Doc. Nos., 77, 82.)  Therefore, only Respondent's Response from April 28, 2023, will be considered as responsive to Hoerig's Objections from April 17, 2023.

[9] Hoerig also filed a "Record Correction" on February 16, 2023, in which Hoerig sought to correct and re-file missing pages she alleged were erroneously filed by the Clerk, and on March 3, 2023, Respondent filed a response thereto.  (Doc. Nos. 71, 72.)  For the purposes of this Memorandum Opinion and Order, Hoerig's Record Correction will be considered with Hoerig's Objections.  (Doc. No. 71.)

The clearly erroneous standard applies to factual findings, while legal conclusions are reviewed under the contrary to law standard. *E.E.O.C. v. Burlington N. & Santa Fe Ry. Co*., 621 F. Supp. 2d 603, 605 (W.D. Tenn. 2009).  As the Sixth Circuit has explained, "'[a] [factual] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Bisig v. Time Warner Cable, Inc*., 940 F.3d 205, 219 (6th Cir. 2019) (quoting *United States v. U.S. Gypsum Co*., 333 U.S. 364, 395 (1948)).  "An order is 'contrary to the law' when it 'fails to apply or misapplies relevant statutes, case law, or rules of procedure.'"  *Id*.  (quoting *United States v. Winsper*, 2013 WL 5673617, at *1 (W.D. Ky. Oct. 17, 2013)).

When a petitioner objects to a magistrate judge's resolution of a dispositive matter, the district court reviews those objections *de novo*.  Fed. R. Civ. P. 72(b)(3).  Specifically, a district judge:

> must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

*Id*.  "A party who files objections to a magistrate [judge]'s report in order to preserve the right to appeal must be mindful of the purpose of such objections: to provide the district court 'with the opportunity to consider the specific contentions of the parties and to correct any errors immediately.'" *Jones v. Moore*, 2006 WL 903199, at *7 (N.D. Ohio April 7, 2006) (citing *Walters*, 638 F.2d at 949–50).

When a party fails to raise a specific objection to a finding of a magistrate judge on a dispositive matter, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  Fed. R. Civ. P. 72(b)(3), Advisory Committee Notes. *See also Thomas*, 474 U.S. at 150 (stating that "[i]t does not appear that Congress intended to require

district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings.")

## III.  Legal Standards Regarding AEDPA Petitions

### A.  Claims Reviewed on the Merits

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326–27, 337 (1997). The relevant provisions of AEDPA provide:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Clearly established federal law is to be determined by the holdings (as opposed to the dicta) of the United States Supreme Court.  *See Parker v. Matthews*, 567 U.S. 37 (2012); *Renico v Lett*, 559 U.S. 766 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Shimel v. Warren*, 838 F.3d 685, 695 (6th Cir. 2016); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  Moreover, the Supreme Court has indicated that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court."  *Parker*, 567 U.S. at 48–49; *see also Lopez v. Smith*, 574 U.S. 1, 4 (2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general principle of Supreme

Court jurisprudence into a specific legal rule that this Court has not announced.'") (quoting *Marshall v. Rodgers*, 569 U.S. 58 (2013)).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413; *see also Carter v. Bogan*, 900 F.3d 754, 767 (6th Cir. 2018).  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.  See also Shimel,* 838 F.3d at 695.  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id*. at 410–12. "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 F. App'x 511, 516 (6th Cir. 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86 (2011), the Supreme Court held that as long as "fair minded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA.  *Id.* at 786 (internal quotation marks omitted).  The Court explained that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state

court's contrary conclusion was unreasonable." *Id.* at 785. The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id.* (internal quotation marks omitted). Therefore, a petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." *Id.* at 786–87. This is a very high standard, which the Supreme Court readily acknowledged. *Id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.").

### B.     Procedural Default

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice. *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006). A claim may become procedurally defaulted in two ways. *Id.* First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court. *Id.*; *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.[10] *Id.*

---

[10] In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted. *Maupin*, 785 F.2d at 135. Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice." *Id.* at 138–39; *Barkley v. Konteh*, 240 F. Supp. 2d 708 (N.D. Ohio 2002). "To inform this inquiry, we look to the last explained state court judgment." *Stojetz v. Ishee*, 892 F.3d 175, 191 (6th Cir. 2018) (internal quotation marks and citations omitted).

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).  If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted.[11]  *See Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991); *Lundgren*, 440 F.3d at 763; *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) ("[A] claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.").

Where a petitioner has procedurally defaulted claims, "federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.  Demonstrating cause requires a petitioner to show that an "objective factor external to the defense impeded counsel's efforts to comply" with the state procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). *See also Gerth v. Warden, Allen Oakwood Corr. Inst.*, 938 F.3d 821, 830 (6th Cir. 2019).  "Prejudice, for purposes of procedural default analysis, requires a showing that the default of the claim not merely created a possibility of prejudice to the defendant, but that it worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *Jamison v. Collins*, 291 F.3d 380,

---

[11] This second type of procedural default is often confused with exhaustion.  Exhaustion and procedural default, however, are distinct concepts.  The AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456 U.S. at 125 n.28.  Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default, and not exhaustion, bars federal court review. *Id.*  Thus, "[w]hen a petitioner has failed to exhaust his state remedies, and when he can no longer do so under state law, his habeas claim is procedurally defaulted." *Adams v. Burton*, 2016 WL 6610219, at *2 (6th Cir. Nov. 8, 2016) (citing *O'Sullivan*, 526 U.S. at 848).

388 (6th Cir. 2002) (citing *United States v. Frady,* 456 U.S. 152, 170–71 (1982)).  *See also Beuke v. Houk*, 537 F.3d 618, 634 (6th Cir. 2008).

### C.    Cognizable Federal Claim

Under 28 U.S.C. § 2254(a), a state prisoner may challenge his custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  A petitioner's claim is not cognizable on habeas review if it "presents no federal issue at all."  *Bates v. McCaughtry*, 934 F.2d 99, 101 (7th Cir. 1991).  Thus, "errors in application of state law . . . are usually not cognizable in federal habeas corpus" and must be dismissed on that basis unless the state court's state-law ruling violates a federal constitutional right.  *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (citing *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983)); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.").  A federal habeas court does not function as an additional state appellate court; it does not review state courts' decisions on state law or procedure.  *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (citing *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987)).  Instead, "federal courts must defer to a state court's interpretation of its own rules of evidence and procedure" in considering a habeas petition.  *Id.* (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)).  Further, a petitioner may not convert a claim asserting state law error into a constitutional claim merely by alleging that the failure to follow a state rule violated his due process rights.  *Rivera v. Illinois*, 556 U.S. 148, 158 (2009) ("The Due Process Clause . . . safeguards not the meticulous observance of state procedural prescriptions, but "the fundamental elements of fairness in a criminal trial."); *see also Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process.")

23

(citation omitted).  Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67–68); *see also Allen*, 845 F.2d at 614 (stating that a federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure).

Nonetheless, habeas relief may be available if an alleged error of state law subjected the petitioner to a "fundamentally unfair" criminal process.  *Williams*, 460 F.3d at 816. "[T]he category of infractions that violate fundamental fairness is defined very narrowly," and includes only state rulings that "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Bey*, 500 F.3d at 521 (cleaned up).  The habeas petitioner bears the burden of showing "the principle of procedure violated by the rule (and allegedly required by due process)" is fundamental.  *Id.*

## IV.  Analysis

As a preliminary matter, the Court notes that Hoerig's Objections[12] present over 300 pages of largely incoherent and indecipherable arguments, along with "notations" that Hoerig added to dozens of copied-and-pasted full-length court opinions, drawings, and reproductions of previously submitted exhibits.  (*See generally* Doc. No. 82; *see also id.* at PageID# 9867.)  While contending that her imprisonment "does not facilitate [the] concise[] and coherent filing of motions and records," Hoerig nonetheless urges the Court to "carefully look at her arguments and consider all the exhibits

---

[12] In her Response to Hoerig's Objections, Respondent argues, without examining any particular page of Hoerig's Objections, that Hoerig only lodges "non-specific and non-responsive arguments" and does not specifically object to any of the R&R's determinations.  (Doc. No. 83 at PageID#s 9902, 9904.)  Because the Response is brief and does not address any particular page or argument from Hoerig's Objections, the Court will address Respondent's Response as appropriate.

submitted."  (*Id.* at PageID# 9867.)  Hoerig also suggests that it is "important" that the Court "look at each Exhibit to find the arguments written in the Exhibit," and that it "is up to the Court to have the patience to look at the sound arguments made and properly tied to their respective prima facie evidence."  (*Id.* at PageID#s 9867, 9869.)

The Court must explain that this position represents a fundamental misunderstanding of the role of a court reviewing a federal habeas petition, even one submitted by a *pro se* litigant.  "Judges are not like pigs, hunting for truffles buried in briefs."  *Knoefel v. Phillips*, 2021 WL 8894449, at *20 (N.D. Ohio Apr. 23, 2021) (citing *Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011)) (quotation marks omitted).  In other words, once an R&R is issued and a petitioner files objections, the Court need not "find" or "look" for the petitioner's arguments as Hoerig suggests. Rather, in raising objections, a petitioner "must direct the [D]istrict [J]udge's attention to specific issues decided by the [Magistrate Judge] contrary to the petitioner's petition" and identify a particularized error in the R&R's analysis.  *Williams v. Fender*, 2024 WL 1169831, at *2 (N.D. Ohio Mar. 18, 2024) (citations and alterations omitted); *Krug v. Sheldon*, 2024 WL 310095, at *8 (N.D. Ohio Jan. 26, 2024).

The Court has carefully examined each and every page of Hoerig's Objections.  However, as indicated above, despite Hoerig's *pro se* status, it is not the Court's duty to sift through thousands of pages of previously submitted "exhibits" to locate, identify, and articulate Hoerig's arguments for her.  *See Salyers v. Burgess*, 2024 WL 1068319, at *3 (W.D. Mich. Mar. 12, 2024) (refusing to sift through "almost 300 mostly handwritten pages" and "more than 500 pages of exhibits" attached to *pro se* habeas petitioner's petition).  In other words, only the specific arguments Hoerig has comprehensibly and clearly presented will be addressed and considered.

Further, the Magistrate Judge has noted that Hoerig's 5,000 pages of exhibits are part of the record but observes that Hoerig's exhibits are "nearly incomprehensible." (Doc. No. 70 at PageID#s 9309–10.)  Nevertheless, the Magistrate Judge "endeavored to address each of [Hoerig's] legal arguments and their supporting documents," and, when appropriate, "reached the merits of Hoerig's arguments even if they were not properly preserved or presented to this Court." (*Id.* at PageID# 9352 n.9.)  To combat these comprehensibility issues, Hoerig asserts that she filed an "index" to her Traverse after the R&R was released. (Doc. No. 82 at PageID# 9836.)  However, any grounds, arguments, or clarification Hoerig desired to make in support of her Petition should have been made to the Magistrate Judge prior to the release of the R&R.  Indeed, the Magistrate Judge initially ordered Hoerig to supply briefs that "make specific reference to those portions of the record by citing to the designated exhibit number and page number." (Doc. No. 12 at PageID# 24.)  Hoerig's failure to abide by the Magistrate Judge's Order to make specific reference to certain exhibits cannot be ameliorated by the provision of an index after issuance of the R&R.  *See Garn v. Haviland*, 2023 WL 6149916, at *19 (N.D. Ohio Feb. 13, 2023), *report and recommendation adopted*, 2023 WL 6146641 (N.D. Ohio Sept. 20, 2023) (finding "unclear [as to] what specific . . . determination [petitioner] is challenging because he does not explain in either his merits brief or his traverse how his arguments relate to any specific exhibits" to be in violation of magistrate judge's initial order requiring petitioner to make specific reference to portions of record supporting his arguments).

With these principles in mind, the Court turns to Hoerig's Objections.

**A.      Non-Dispositive Matters**

**1.      Motion for Evidentiary Hearing**

Hoerig first contends that she is entitled to an evidentiary hearing and argues that the Magistrate Judge unreasonably "dismissed" her Petition without one.  (Doc. No. 82 at PageID#s 9835, 9868.)

Hoerig's contention on this ground is meritless.  When Hoerig filed her initial Memorandum in Support of Her Petition, Hoerig indicated that she requested an evidentiary hearing.  (Doc. No. 4 at PageID# 24.)   In fact, her initial Memorandum in Support, as well as her Supplemental Memorandum in Support of Her Petition, were initially docketed as Motions for an Evidentiary Hearing.  (Doc. No. 18 at PageID# 488.)   However, Hoerig thereafter filed a "Motion to Re-Name Doc#4 and Doc#14 on the Docket," specifically representing that her initial Memorandum in Support and her Supplemental Memorandum in Support were "not a Motion for Evidentiary Hearing."  (*Id.*) Therefore, upon Hoerig's own motion, the Court updated the docket to reflect these two documents as being Memoranda in Support as opposed to Motions for an Evidentiary Hearing.  (Non-Document Order, June 30, 2022.)   Indeed, to the extent that Hoerig's later-filed Traverse and supplemental briefing included a request for an evidentiary hearing, the Magistrate Judge found that Hoerig "must present more than conclusory statements to obtain an evidentiary hearing on a claim of ineffective assistance of counsel."  (Doc. No. 70 at PageID# 9349 n.7.)

Hoerig did not make a clear, express motion or request for an evidentiary hearing at any other point, and therefore cannot now assign error to the Magistrate Judge based on her failure to provide such a hearing. *See Hasan v. Ishee*, 2011 U.S. Dist. LEXIS 98954, at *4–5 (S.D. Ohio Sept. 1, 2011) (finding request for evidentiary hearing waived where petitioner did not request hearing before magistrate judge).  If there is a request hidden among Hoerig's 5,000-page box of exhibits, for the reasons discussed above, the Court need not search for it.  Accordingly, the Court finds that the

Magistrate Judge's denial of an evidentiary hearing is neither clearly erroneous nor contrary to law. Hoerig's "objection" is without merit and overruled.[13]

### 2. Motions for Appointment of Counsel and "Expert Assistance"

Hoerig also "objects" on the basis that she was entitled to the appointment of counsel for her federal habeas claims and the appointment of a "forensic expert to challenge the State's doctor." (Doc. No. 82 at PageID#s 9838, 9866, 9868, 9869.)

Hoerig filed a Motion for Appointment of Counsel and a Motion for Expert Assistance.  (Doc. Nos. 2, 3.)  The Magistrate Judge did not expressly consider in her R&R whether Hoerig would be entitled to counsel or to a forensic expert.  (*See generally* Doc. No. 70.)  Therefore, the Court will review Hoerig's requests *de novo*.

Generally, in considering whether a petitioner is entitled to counsel, courts must acknowledge that a habeas corpus proceeding is civil in nature and the Sixth Amendment right to counsel afforded for criminal proceedings does not apply.  *See Cobas v. Burgess*, 306 F.3d 441, 444 (6th Cir. 2002) (citing *McCleskey v. Zant*, 499 U.S. 467, 495 (1987)); *see also Stockman v. Berghuis*, 627 F. App'x 470, 475 (6th Cir. 2015); *Ross v. Coleman*, 2019 WL 8333533 at *11 (N.D. Ohio July 1, 2019).  A district court must appoint counsel for an indigent petitioner when an evidentiary hearing is required or when necessary for the petitioner's effective utilization of discovery.[14]  *See* Rules Governing

---

[13] To the extent the Magistrate Judge did not expressly rule on the evidentiary hearing issue, thereby requiring the Court to review Hoerig's argument *de novo*, the Court still concludes that her argument is without merit and is rejected.

[14] In addition, an indigent petitioner seeking to vacate or to set aside a death sentence has a statutory right to appointed counsel, as well as expert and investigative services. 18 U.S.C. § 3599(a)(2). Here, however, Hoerig is not seeking to vacate or set aside a death sentence.

Section 2254 Cases, Rule 6(a).[15]   In all other circumstances, a district court has considerable discretion in deciding whether to appoint counsel.  The Sixth Circuit has noted, however, that appointment of counsel in non-capital habeas proceedings is justified only in "exceptional" circumstances.  *See Stockman*, 627 F. App'x at 475 (stating the privilege of appointment of counsel in habeas proceedings is justified "only in exceptional circumstances.") (citing *Lavado v. Keohane*, 992 F.2d 601, 605–06 (6th Cir. 1993)).  Likewise, the appointment of a non-psychiatric expert or of an expert for non-capital defendants has not been constitutionally mandated.  *See Irwin v. Trim*, 2014 WL 201512, at *7–8 (N.D. Ohio Oct. 3, 2013), *report and recommendation adopted*, 2014 WL 201512 (N.D. Ohio Jan. 17, 2014).

The Court rejects Hoerig's requests. As to the appointment of counsel, Hoerig does not articulate any convincing reason as to why she is entitled to the appointment of counsel.  Specifically, Hoerig only asserts that she is entitled to appointment of counsel because English is not her first language and her case is complex.  (*See, e.g.*, Doc. No. 82 at PageID#s 9833, 9835, 9838, 9868.)  Yet Hoerig has demonstrated several times that she is able to successfully move and articulate a basis for relief, such as extensions of time.  (*See, e.g.*, Doc. Nos. 18, 28.)  Hoerig does not otherwise argue or show that hers is such an exceptional case that the appointment of counsel is necessary, and the issues in this case are not unusually complex.  For example, Hoerig does not contend or assert that she labors under disabilities unusual for a *pro se* petitioner, and as mentioned above, Hoerig's voluminous exhibits and motions practice indicate that she is capable of understanding case law and seeking

---

[15] *See* 28 U.S.C. § 2254(h) ("Appointment of counsel under this section shall be governed by section 3006A of title 18.").  18 U.S.C. § 3006A(a)(2)(B) provides in part: "Whenever the United States magistrate judge or the court determines that the interests of justice so require, representation may be provided for any financially eligible person who . . . is seeking relief under [§ 2254]."

particular relief as needed. Hoerig's conclusory contentions in her Objections are thus insufficient to demonstrate cause for the Court to appoint counsel. Accordingly, Hoerig's argument is meritless and her request for appointment of counsel is denied.

As to the appointment of an expert, Hoerig's argument in her Objections is comprised of conclusory assertions that Hoerig is entitled to an expert. (Doc. No. 82 at PageID#s 9838, 9868.) This request is also rejected. In her Motion for Expert Assistance, Hoerig lists six experts that she believes the Court should fund to establish an alternative theory as to which bullet killed Karl and that Hoerig was subject to abuse. (Doc. No. 3 at PageID# 23.) Nowhere in Hoerig's Motion for Expert Assistance does she explain how or why these experts' appointments are necessary or why she is unable to establish her Grounds for Relief without them. (*Id.*) Hoerig is not a capital Defendant and does not appear to seek a psychiatrist beyond a "battery wife syndrome expert." (*Id.*) Therefore, Hoerig has not demonstrated that she is entitled to the appointment of an expert, and accordingly, her request for such is denied.[16]

### B. Dispositive Matters

#### 1. Ground One

In Ground One, Hoerig asserts that the state trial court erred and abused its discretion by "denying her Crim. R 29(A) motion for acquittal before closing arguments," which she had moved for on the basis that the State had failed to present sufficient evidence of premeditation and prior calculation, and therefore she could not have been convicted of aggravated murder beyond a

---

[16] In her Objections, Hoerig also requests that the Court send her a copy of her Objections so that she can access the PageID#s of her Objections. (Doc. No. 82 at PageID# 9900.) The Court finds no need to do so. Hoerig does not supply any authority which would indicate that the Court must forward to her a copy of her *own* filings. The Court reminds Hoerig that, as a *pro se* litigant, she can register for a read-only PACER account that would allow her to view filings in this case.

reasonable doubt, in violation of her due process rights under the Fifth, Sixth, and Fourteenth Amendments.  (Doc. No. 14-1 at PageID# 39.)

This claim was presented on direct appeal to the state appellate court, which rejected it on the merits as follows:

{¶37} Under the first assignment of error, Claudia argues there was insufficient evidence of prior calculation and design to sustain her conviction.

{¶38} "A claim challenging the sufficiency of the evidence invokes a due-process concern and raises the question whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 165; Crim.R. 29(A) ("[t]he court * * * shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction").

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "Evaluation of the witnesses' credibility is not relevant to a sufficiency analysis." *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 207.

{¶39} In order to convict Claudia of Aggravated Murder, the State was required to prove beyond a reasonable doubt that she "purposely, and with prior calculation and design, cause[d] the death" of Hoerig. R.C. 2903.01(A).

{¶40} "[T]he phrase 'prior calculation and design' is a single indivisible term, describing the mens rea element of proof necessary to find a violation of R.C. 2903.01(A)." *State v. Taylor*, 78 Ohio St.3d 15, 18, 676 N.E.2d 82 (1997).

[R.C. 2903.01(A) employs] the phrase, "prior calculation and design," to indicate an act of studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim. Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must be sufficient to meet the

31

proposed test of "prior calculation and design." In this context, momentary deliberation is considered insufficient to constitute a studied scheme to kill.

(Citation omitted.) *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 17.

{¶41} The Ohio Supreme Court has "traditionally" considered three factors in determining whether a defendant has acted with prior calculation and design: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?' " *Id.* at ¶ 20, quoting *Taylor* at 19. However, "it is not possible to formulate a bright-line test that emphatically distinguishes between the presence or absence of 'prior calculation and design.'" *Taylor* at 20. "Instead, each case turns on the particular facts and evidence presented at trial." Id.

{¶42} Claudia argues that the "mere fact that [she] purchased a firearm and then learned how to use it does not support a conclusion that [she] intended to kill her husband." Appellant's brief at 3. We disagree. The fact that Claudia purchased a firearm with a laser sight, learned how to use it, and then used it to kill her husband at the next opportunity is evidence which, if believed, would convince the average mind, beyond a reasonable doubt, that she acted with prior calculation and design. By her own admission, Claudia and Hoerig's marriage was troubled and she purchased the firearm with the intent to kill - the issue being whom she intended to kill. Given the circumstances, the evidence is sufficient to support the conclusion that Hoerig rather than Claudia was the intended victim.

{¶43} Claudia also argues that her flight to Brazil might indicate consciousness of guilt that "some crime had been committed," but it is not evidence of prior calculation and design inasmuch as "[n]one of the travel arrangements had already been made when the homicide occurred and * * * one would expect to find prior travel arrangements had been made." Appellant's brief at 4. The fact that Claudia did not make arrangements to travel to Brazil until after Hoerig's murder bears on the weight of the evidence, and not its sufficiency.

{¶44} The first assignment of error is without merit.

*State v. Hoerig*, 2020 WL 1685624, at *4–5 (Ohio App. Apr. 6, 2020).

The Magistrate Judge found that, to the extent that Hoerig challenges the trial court's denial of her motion for acquittal on the basis of state law, her claim is not cognizable on habeas review, and recommended that Ground One be dismissed on this basis.  (Doc. No. 70 at PageID# 9333.)  The

Court agrees.  Hoerig does not raise a specific objection to the Magistrate Judge's conclusion that a challenge to the trial court's denial of her motion for acquittal, if made on the basis of state law, is not cognizable.  After reviewing the Magistrate Judge's discussion of this matter, the Court finds no clear error.  *See Cannon v. Bobby*, 2024 WL 1054450, at *8 (N.D. Ohio Jan. 26, 2024), *report and recommendation adopted*, 2024 WL 1051630 (N.D. Ohio Mar. 11, 2024) (review of motion for acquittal on basis of state law not cognizable).  Accordingly, the Court accepts the Magistrate Judge's recommendation that Ground One be dismissed to the extent Hoerig challenges the trial court's denial of her motion for acquittal on the basis of state law.

The Magistrate Judge then determined that Hoerig's sufficiency of the evidence claim, if challenging the trial court's denial of her motion on the basis of federal law, is without merit.  Specifically, the Magistrate Judge considered this claim on the merits, applying AEDPA deference to the state appellate court's decision.  (Doc. No. 70 at PageID#s 9333–38.)  After discussing the state appellate court's reasoning, the Magistrate Judge found that the court relied on *State v. Jenks*, 574 N.E.2d 492 (1991), which follows the sufficiency of the evidence standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979).  (*Id.* at PageID# 9336.)  The Magistrate Judge observed that, under *Jackson*, "a sufficiency of the evidence claim is reviewed by determining whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  (*Id.* (citing *Jackson*, 443 U.S. at 319).)  The Magistrate Judge determined that the state appellate court "correctly identified and applied the governing legal principle" as set forth in *Jackson*.  (*Id.*)  Hoerig does not contest or object to this determination.  The Court concludes that the Magistrate Judge correctly determined that the state

33

appellate court identified and applied the appropriate legal standard for sufficiency of the evidence claims from *Jackson*.

After recounting the elements for aggravated murder under Ohio law,[17] the Magistrate Judge concluded that the state appellate court's decision was not an objectively unreasonable application of federal law.  In particular, according to the Magistrate Judge, the appellate court considered Hoerig's marriage and pregnancy problems and the two-day turnaround from Hoerig's purchase of and practice with the firearm and her shooting of her husband.  (*Id.* at PageID# 9338.)  The Magistrate Judge also determined that Hoerig's alternative arguments, e.g. that her intent was to commit suicide and that she was fearful that the gun's recoil would only leave her disfigured, "go to the weight of the evidence, not sufficiency."  (*Id.*)

The Court agrees with the Magistrate Judge.  Before reviewing the substance of the state appellate court's decision, the Court must first determine the proper standard of review.  If the state appellate court adjudicated Hoerig's sufficiency of the evidence claim "on the merits," the Court

---

[17] The state appellate court explained the elements of aggravated murder as follows: "[T]o convict [Hoerig] of Aggravated Murder, the State was required to prove beyond a reasonable doubt that she 'purposely, and with prior calculation and design, cause[d] the death' of [Karl]. [O.R.C. 2903.01(A)." *State v. Hoerig*, 2020 WL 1685624, at *4.  In defining "prior calculation and design," the state appellate court observed that the phrase "is a single indivisible term, describing the *mens rea* element of proof necessary to find a violation of R.C. 2903.01(A)."  *Id.* (citing *State v. Taylor*, 78 Ohio St.3d 15, 18, 676 N.E.2d 82 (1997)).  Additionally, according to the state appellate court, Ohio Revised Code 2903.01(A) employs "the phrase, 'prior calculation and design,' to indicate an act of studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim. Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must be sufficient to meet the proposed test of 'prior calculation and design.' In this context, *momentary deliberation is considered insufficient* to constitute a studied scheme to kill." (citing *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 17).

The state appellate lastly observed as follows: "[T]he Ohio Supreme Court has "traditionally" considered three factors in determining whether a defendant has acted with prior calculation and design: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?'" *Id.* at ¶ 20, quoting *Taylor* at 19. However, "it is not possible to formulate a bright-line test that emphatically distinguishes between the presence or absence of 'prior calculation and design.'" *Taylor* at 20. "Instead, each case turns on the particular facts and evidence presented at trial." *Id.*  *State v. Hoerig*, 2020 WL 1685624, at *4.

applies deference under the AEDPA and may grant relief only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable application of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1) & (2). *See Smith v. Cook*, 956 F.3d 377, 385–86 (6th Cir. 2020). If the state court did not evaluate the merits of Hoerig's claim, the Court reviews that claim *de novo*. *Id*. *See also Rice v. White*, 660 F.3d 242, 252 (6th Cir. 2011) (citing *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005)).

In this case, the state appellate court adjudicated Hoerig's sufficiency of the evidence claim on the merits. As discussed above, the state appellate court noted the various aspects of trial testimony which could lead the jury to conclude that Hoerig acted with prior calculation and design. *State v. Hoerig*, 2020 WL 1685624, at *4–5. In doing so, the state appellate court relied on *State v. Jenks*, 574 N.E.2d 492 (1991), which it acknowledged followed the federal standard of *Jackson v. Virginia*. Therefore, the Court must determine whether the state appellate court unreasonably applied the principles enunciated in *Jackson* to Hoerig's sufficiency of the evidence claim.

Under the *Jackson* standard, a petitioner who claims that the evidence at trial was insufficient for a conviction must demonstrate that, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Scott v. Mitchell*, 209 F.3d 854, 885 (6th Cir. 2000). The role of the reviewing court in considering such a claim is limited:

> A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court. It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims. The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim.

*Matthews v. Abramajtys*, 319 F.3d 780, 788–89 (6th Cir. 2003) (internal citations omitted).

Moreover, it is well established that "'attacks on witness credibility are simply challenges to the

quality of the government's evidence and not to the sufficiency of the evidence.'" *Martin v. Mitchell*,

280 F.3d 594, 618 (6th Cir. 2002) (quoting *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir. 1984)

*abrogated on other grounds by Buford v. United States*, 532 U.S. 59 (2001)). *See also Moreland v.*

*Bradshaw*, 699 F.3d 908, 920 (6th Cir. 2012).

Consistent with these principles, the Supreme Court has emphasized that habeas courts must

review sufficiency of the evidence claims with "double deference:"

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings
> because they are subject to two layers of judicial deference. First, on direct appeal, 'it
> is the responsibility of the jury—not the court—to decide what conclusions should be
> drawn from evidence admitted at trial. A reviewing court may set aside the jury's
> verdict on the ground of insufficient evidence only if no rational trier of fact could
> have agreed with the jury.' *Cavazos v. Smith*, 565 U.S. 1, ——, 132 S.Ct. 2, 4, 181
> L.Ed.2d 311 (2011) (per curiam). And second, on habeas review, 'a federal court may
> not overturn a state court decision rejecting a sufficiency of the evidence challenge
> simply because the federal court disagrees with the state court. The federal court
> instead may do so only if the state court decision was 'objectively unreasonable.'"
> *Ibid.* (quoting *Renico v. Lett*, 559 U.S. 766, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d
> 678 (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 651 (2012). Under this standard, "we cannot rely simply upon

our own personal conceptions of what evidentiary showings would be sufficient to convince us of the

petitioner's guilt," nor can "[w]e . . . inquire whether any rational trier of fact would conclude that

petitioner . . . is guilty of the offenses with which he is charged." *Brown v. Konteh*, 567 F.3d 191,

205 (6th Cir. 2009). Rather, a habeas court must confine its review to determining whether the state

court "was unreasonable in its conclusion that a rational trier of fact could find [petitioner] guilty

beyond a reasonable doubt based on the evidence introduced at trial." *Id*.

36

Upon a careful review of the trial transcript, the Court concludes that Hoerig's aggravated murder conviction[18] is supported by substantial evidence.  In this case, Hoerig does not dispute that she killed her husband using the .357 magnum revolver she purchased the week before the shooting. Rather, Hoerig only disputes whether sufficient evidence supports the jury's verdict finding that she had the requisite intent, i.e. "prior calculation and design," in doing so to establish guilt beyond a reasonable doubt of aggravated murder.

The state appellate court accurately summarized the trial testimony and evidence included in the record.  As noted by the state court, evidence was introduced at trial that Hoerig and Karl's marriage was in trouble, that Karl was considering divorcing Hoerig, and that Hoerig pondered killing Karl if he did divorce her.  Specifically, the jury heard testimony from Henry, a "close friend" of Karl's that, in February 2007, Karl confided that his marriage with Hoerig was failing and that they were going to divorce.  (Doc. No. 30-2 at Tr. 980, 982.).  Karl even sought to rent a house where he intended to live after his separation from Hoerig and showed it to Henry.  (*Id.* at Tr. 547–49, 982.) Karl had also informed Dodge,[19] another friend, that he intended to leave Hoerig.  (*Id.* at Tr. 985, 990.) Dodge then offered Karl the opportunity to stay at his place.  (*Id.* at Tr. 990.)

Hoerig herself testified that, on March 9, 2007, the week before Karl was found dead, she learned that she was pregnant.  (Doc. No. 30-2 at Tr. 1087.)  Hoerig testified that she knew Karl was considering divorce, so she thought, "if I tell him I'm pregnant, my chances of me fixing this damage

---

[18] Hoerig does not challenge or dispute the firearm specification that was applied to her aggravated murder sentence.

[19] The state appellate court mistakenly referred to Mr. Dodge as "Harry Dodge."  *State v. Hoerig*, 2020 WL 1685624, at *1 (Ohio App. 11th Dist. Apr. 6, 2020).  Mr. Dodge's complete name is "Gary Lee Dodge."  (Doc. No. 30-2 at Tr. 985.)

is very small. So I'll go, I'll prepare plan B, which is if I cannot reverse the damage, if I cannot convince him to try one more time, I'm gonna kill myself." (*Id.* at 1087–89.)

The jury also heard testimony that, at a social gathering in August 2006, Hoerig told Bridges, a "good friend" of Karl's, that "[i]f he ever leaves me, I'd kill him." (Doc. No. 30-2 at Tr. 910.)

Other evidence introduced at trial showed that Hoerig purchased a revolver with a laser sight and hollow point ammunition and learned how to use it the week before Karl's body was discovered on March 15, 2007. Specifically, Martin testified that, on March 10, 2007, Hoerig came to the gun store where he was working and, with the intent to use it for home defense, purchased a .357 magnum revolver. (Doc. No. 30-2 at Tr. 571–72, 575.) Hoerig also purchased a Crimson Trace laser grip for the revolver, and Martin installed it for her. (*Id.* at Tr. 580.) After Hoerig purchased the revolver, she brought it to the JCL Shooting Range in Warren, Ohio, where she used it on the practice range. (*Id.* at Tr. 606, 611.)

The jury next heard testimony that, after Hoerig was apprehended in Brazil, Hoerig admitted to killing Karl. Specifically, an FBI agent testified that Hoerig commented to him that, "a wife doesn't kill her husband without having a good reason." (Doc. No. 30-2 at Tr. 814–15.) According to Hoerig, her pregnancy and suicidal ideation led her to purchase a gun with the intention of committing suicide, and that during her confrontation with Karl, she shot and killed him. (*Id.* at Tr. 815.)

Hoerig also testified after she shot Karl, she attempted to use the suicide mount to commit suicide, but the revolver did not fire. (*Id.* at Tr. 1111–12.) Following this unsuccessful attempt, Hoerig fled to Brazil. (*Id.* at Tr. 1115–19.)

Considering the above, the Court finds that the state appellate court reasonably concluded that sufficient evidence supported the jury's finding that Hoerig acted with prior calculation and design when she shot and killed her husband.  The State introduced evidence of Hoerig's motive, i.e., to prevent her husband from leaving her while she was pregnant.  The State's other circumstantial evidence showed that Hoerig purchased the .357 magnum revolver and laser sight and learned how to practice shooting it with the intent to kill someone.  While Hoerig contended that the sole target was herself, and that she only killed her husband in "sudden passion," one of the State's witnesses, Bridges, testified that Hoerig herself had previously commented that, if Karl ever left her, she would "kill him."  (Doc. No. 30-2 at Tr. 910.)  The Court finds, therefore, that it was not unreasonable for the state appellate court to conclude that there was sufficient evidence of Hoerig's prior calculation and design to kill Karl given the (1) evidence of Hoerig's motive; (2) Karl's intent to divorce Hoerig and move out to a rental house; and (3) Hoerig's admitted knowledge that her marriage was failing and that Karl was going to divorce her.

As to the Magistrate Judge's conclusion that the state appellate court's decision was not an objectively unreasonable application of federal law, Hoerig presents several objections.  First, Hoerig challenges the prosecutor's use of forensic pathologist Dr. Felo, in particular his "ambush" theory, as "improper" because it exceeded the scope of his expertise under *Daubert*.  (Doc. No. 82 at PageID#s 9616, 9744, 9850.)  And, according to Hoerig, there was no direct evidence that her husband was on the steps when Hoerig shot him, and Detective Yannucci testified that the evidence was not definitive. (*Id.* at PageID#s 9604–06.)

These arguments are rejected.  The state appellate court did not appear to consider Karl's position on the steps in evaluating whether Hoerig acted with prior calculation and design, so it is

unclear how this contention relates to the state court's opinion.  Nevertheless, the Court acknowledges that the evidence presented by the State was entirely circumstantial.  The Supreme Court has held, however, that "[c]ircumstantial evidence . . . is intrinsically no different from testimonial evidence," and that it is sufficient if the jury is convinced beyond a reasonable doubt.  *See Holland v. United States*, 348 U.S. 121, 138–40 (1955); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (stating that "we have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required").  Thus, the fact that Hoerig's conviction was based on circumstantial evidence is not, standing alone, sufficient to show that it was not supported by the evidence under the standard set forth in *Jackson v. Virginia*, *supra*.

Second, Hoerig asserts that her conviction was not supported by sufficient evidence because (1) Bridges' testimony that she was Karl's friend before his death was false and therefore lacked credibility; and (2) contrary to Dr. Felo's testimony and as Hoerig testified, based on the lack of blood splatter, it was the very first bullet she fired that killed Karl, and not the second bullet that Dr. Felo said might be fatal.[20]  (Doc. No. 82 at PageID# 9741.)[21]  These arguments are without merit.  It is

---

[20] The jury heard testimony from Dr. Felo, who testified concerning the circumstances of Karl's death based on his wounds.  Specifically, Dr. Felo testified that Karl was shot three times.  (Doc. No. 30-2 at Tr. 936.)  According to Dr. Felo, Karl was shot once in the right shoulder, notated as Wound A, which would have incapacitated and prevented him from moving but was a non-fatal wound.  (*Id.* at Tr. 939–40.)  Another shot impacted the center of his back, notated as Wound B, which would have been "potentially lethal" since it traveled through one of his lungs and other vital structures.  (*Id.* at Tr. 940–43.)  Dr. Felo opined that Karl was "on the floor" when he suffered Wound B.  (*Id.* at Tr. 943.)  The last shot, notated as Wound C, was a fatal wound that came from a shooter who was also positioned "on the first floor" and was received while Karl's "head is near or on the floor."  (*Id.* at Tr. 945–46, 948, 961.)  The state appellate court did not appear to consider Dr. Felo's testimony as to Karl's death in evaluating whether sufficient evidence existed to demonstrate that Hoerig killed Karl with prior calculation and design.

[21] Hoerig also asserts that Lane's testimony that Karl's body was found at the bottom of the stairs was not convincing evidence of premeditation and "only corroborates [Hoerig's] version of the events." (Doc. No. 82 at PageID# 9741.)  Not only was this argument, for the reasons described below, not within the scope of the state appellate court's consideration of Hoerig's sufficient evidence claim, but it is not clear that the state appellate court considered Lane's testimony as to where he found Karl's body in her evaluation of her sufficient evidence claim.  This argument is therefore rejected.

well established that the credibility of witness testimony is outside the scope of the state appellate court's consideration of Hoerig's claim of insufficient evidence.  *See Martin*, 280 F.3d at 618.  The state appellate court properly considered all of the evidence in the light most favorable to the State and determined there was sufficient evidence to convict Hoerig.  The standard of review applied by the state appellate court coincides with the standard for sufficiency of the evidence set forth in *Jackson, supra*.  Hoerig points to no federal legal precedent requiring the state appellate court, in the context of a challenge to the sufficiency of the evidence, to engage in the evidence-weighing that she requests.

Third, Hoerig insists that the trial court "misapplied the standard of review for intent" when it reviewed her "case of aggravated felony murder on a theory of transferred intent."  (Doc. No. 82 at PageID# 9765.)  According to Hoerig, she shot and killed her husband and she purchased the .357 magnum revolver with the sole intention of committing suicide.  (*Id.*)  According to Hoerig, because suicide is not a crime or a wrongful act, the intent to commit suicide cannot supply a "transferred intent" for "aggravated felony murder."  (*Id.* at PageID#s 9759, 9765.)  Thus, Hoerig appears to insist that her intent to commit suicide cannot "transfer" to the premeditated intent to kill her husband.  (*Id.*)

These arguments are also without merit.  While Hoerig is correct that suicide is not criminalized as a felony in Ohio, Hoerig was charged with aggravated murder and not felony murder. As such, the criminality of suicide is not relevant to Hoerig's case.  *See State v. Sage*, 510 N.E.2d 343, 348 (Ohio 1987).  Additionally, Ohio courts have found that, even where a defendant raises the claim that she intended to only commit suicide but another person dies, prior calculation and design to commit the killing can still be found.  *See, e.g.*, *id.* (finding evidence of prior calculation and design for murder "in the manner of the shooting and in the suicide note" where defendant contended

41

decedent committed suicide pursuant to a suicide pact); *see also State v. Turner*, 826 N.E.2d 266, 282 (Ohio 2005) (sufficient evidence of prior calculation and design in killing of second decedent despite defendant's argument that "planned to kill [first decedent], but [second decedent] 'got in the way'" and that defendant committed the murder of second decedent "in a state of emotional distress"). Accordingly, the Court rejects Hoerig's felony murder and transferred intent arguments.

Fourth, Hoerig maintains that the prosecutor failed to disprove her affirmative defense of "sudden passion" or manslaughter. (Doc. No. 82 at PageID#s 9675–79, 9900.) In Ohio, however, the defendant has the burden of demonstrating that he had the requisite passion or rage at the time of the murder to be convicted of manslaughter rather than aggravated murder. *Benge v. Johnson*, 474 F.3d 236, 247 (6th Cir. 2007) (citing *State v. Rhodes*, 590 N.E.2d 261, 365 (Ohio 1992)). Similarly, the lack of the heat of the passion is not an element of aggravated murder, and therefore, the State was not required to prove it at trial. *See Rhodes v. Brigano*, 91 F.3d 803, 804, 809 n.2, 810–11 (6th Cir. 1996). Because Hoerig does not argue or demonstrate otherwise, this argument is also rejected.

Hoerig's Objections to the Magistrate Judge's recommendations concerning Ground One of her Petition are rejected. Accordingly, the Court accepts the Magistrate Judge's recommendation that Ground One be dismissed.

### 2. Grounds Two, Three, Four, and Five

As an initial matter, the Court observes that Hoerig raises no objection to the Magistrate Judge's recommendations that Ground Two be dismissed as not cognizable, and that Grounds Three, Four, and Five be dismissed as procedurally defaulted (to the extent they are raised under federal law)

or not cognizable (to the extent they are raised under state law).  (Doc. No. 70 at PageID#s 9338–48; Doc. No. 82.)  Instead, Hoerig opts to dispute the merits of Grounds Two, Three, Four, and Five.[22]

The Court has carefully reviewed the Report and Recommendation's discussion and analysis of Grounds Two, Three, Four, and Five, and finds no clear error.  (Doc. No. 70 at PageID#s 9338–48.)  Therefore, the Court accepts the Magistrate Judge's conclusions that Ground Two is not cognizable, and that Grounds Three, Four, and Five are procedurally defaulted and/or not cognizable.  Where a claim for relief in a habeas petition is not cognizable, the Court cannot evaluate the merits of the claim unless the petitioner demonstrates fundamental unfairness in the state court ruling.  *Bey v. Bagley*, 500 F.3d 514, 519–20 (6th Cir. 2007); *see also Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).  Likewise, where a claim is procedurally defaulted, the Court cannot evaluate the claim unless the petitioner demonstrates cause and prejudice for the failure to raise it, or that there will be a fundamental miscarriage of justice if the Court does not consider it.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  In her Objections, Hoerig does not offer any specific, substantive argument that the state court's ruling on Ground Two was fundamentally unfair, or that there is cause for her procedural default of Grounds Three, Four, and Five or that the failure to consider them will result in a fundamental miscarriage of justice.  Accordingly, and in the absence of any specific Objection as to these Grounds, the Court accepts the Magistrate Judge's recommendation that Grounds Two, Three, Four, and Five be dismissed.

---

[22] If Hoerig's Objections can be construed as an attempt to excuse her procedural default, Hoerig does not argue or explain what the cause of her failure to raise these issues in her direct appeal would have been or whether there would be a miscarriage of justice in finding these Grounds procedurally defaulted.  Likewise, if Hoerig's objections are construed as an attempt to demonstrate fundamental unfairness in response to their non-cognizability, Hoerig does not explain that the state court's rulings on these issues resulted in a denial of fundamental fairness.  Therefore, these Grounds would still be dismissed.

### 3.    Procedural Default of Grounds Six through Twelve

In Ground Six, Hoerig contends that she was denied her constitutional right to assistance of counsel and due process under the Sixth, Fifth, and Fourteenth Amendments when her trial and appellate counsel failed to provide effective assistance.  (Doc. No. 14-1 at PageID#s 40, 96.)  Hoerig specifically asserts that her trial counsel was ineffective because he: (1) failed to challenge the jury venire because Latinos were underrepresented; (2) failed to subpoena additional witnesses including "expert witnesses"; (3) filed and withdrew a motion to suppress evidence found in one of Hoerig's automobiles; (4) failed to authenticate evidence; and (5) failed to challenge Dr. Felo and Detective Pizzulo.  (*Id.* at PageID#s 96–98.)

Hoerig asserts the following general claims in each of her Grounds Seven through Twelve.  In Ground Seven, the trial court erred in denying her state court motion to dismiss on constitutional speedy trial grounds.  (Doc. No. 14-2 at PageID# 116.)  In Ground Eight, the trial court erred by denying her motion to change venue.  (*Id.* at PageID# 188.)  In Ground Nine, trial counsel was ineffective for failing to object to prejudicial false testimony. (Doc. No. 14-3 at PageID# 245.)  In Ground Ten, the state court prosecutor engaged in misconduct for failing to disclose exculpatory evidence.  (Doc. No. 14-3 at PageID# 262.)  In Ground Eleven, the trial court erred by imposing excessive bail.  (*Id.* at PageID# 264.)  In Ground Twelve, the prosecutor violated the extradition treaty between the United States and Brazil.  (*Id.* at PageID# 266.)

In her R&R, Magistrate Judge explained that, while Ground Six's caption mentions ineffective assistance of *appellate* counsel, Hoerig "fails to develop this argument" and instead argues only the merits of the sub-issues and "makes no mention of how her appellate counsel failed to

44

provide effective assistance." (Doc. No. 70 at PageID# 9349 n.7.)  Thus, the Magistrate Judge implies that Ground Six only raises a claim for ineffective assistance of trial counsel.  (*Id.*)

The Magistrate Judge initially considered the default of Grounds Six through Twelve in tandem.  (Doc. No. 70 at PageID#s 9348–51.)  In doing so, the Magistrate Judge concluded that Grounds Six through Twelve are procedurally defaulted because they were not raised on direct appeal and were only raised for the first time in Hoerig's Rule 26(B) application.  (Doc. No. 70 at PageID#s 9348–50.)  Specifically, the Magistrate Judge found that "Hoerig introduced each of these sub-issues" in her Rule 26(b) application "by arguing that her appellate counsel had been ineffective for failing to raise each of the sub-issues."  (*Id.* at PageID# 9350.)

As a preliminary matter, the Court observes that Hoerig does not dispute or object to the Magistrate Judge's conclusion that Grounds Six through Twelve are procedurally defaulted.  Hoerig undisputedly raised Grounds Six through Twelve for the first time in her Rule 26(B) application.[23] The Court concludes that there is no clear error in the Magistrate Judge's conclusion that these grounds have been procedurally defaulted.  *See Cody v. Sheldon*, 2021 WL 1437557, at *22 (N.D. Ohio Apr. 16, 2021) (finding claim procedurally defaulted because petitioner failed to raise it on direct appeal and state appellate court refused to reopen his direct appeal to allow him to reassert it).  However, if, as discussed below, Hoerig's ineffective assistance of appellate counsel claim is

---

[23] Hoerig contends that, in concluding that Hoerig "does not mention ineffective assistance of appellate counsel in Grounds Seven through Twelve," the "Magistrate lost its way by overlooking" a page from one of her A-Z exhibits. (Doc. No. 82 at PageID# 9837 (citing Doc. No. 48-2 at PageID# 5263).)  Not only is Document Number 48-2 not an argument in Hoerig's Petition or Traverse, but the page Hoerig cites is merely a scan of Hoerig's Rule 26(B) application for reopening.  (*See* Doc. No. 48-2 at PageID# 5263.)  The Magistrate Judge came to her conclusion in referring to the arguments presented in Hoerig's instant habeas Petition and Traverse, which includes her Rule 26(B) application.  Indeed, the Magistrate Judge acknowledged that Hoerig raised Grounds Seven through Twelve in her Rule 26(B) application.  (Doc. No. 70 at PageID# 9350.)  Therefore, Hoerig's Rule 26(B) application is immaterial to whether Grounds Seven through Twelve of Hoerig's instant habeas Petition expressly reference ineffective assistance of appellate counsel.

construed as an attempt to demonstrate cause or excuse for this procedural default, the Court must consider the Magistrate Judge's other conclusions regarding Grounds Six through Twelve and Hoerig's Objections thereto.

### 4. Ineffective Assistance of Appellate Counsel (Grounds Six through Twelve)

Despite the Magistrate Judge's conclusion that Grounds Seven through Twelve did not mention ineffective assistance of counsel, the Magistrate Judge recognized that "if Hoerig had raised [Grounds Seven through Twelve] in the Petition as claims of ineffective assistance of appellate counsel[,] they would not be procedurally defaulted" because they were raised for the first time in Hoerig's Rule 26(B) application.  (*Id.* at PageID# 9351.)  Accordingly, the Magistrate Judge proceeded to address both Ground Six and Grounds Seven through Twelve individually in a "summary fashion," considering both whether Hoerig's ineffective assistance of appellate counsel claim "is viable as a stand-alone claim," as well as "whether it can serve as the cause to excuse the procedural default" for Grounds Six through Twelve."  (*Id.* at PageID#s 9348–51, 9351 n.9, 9353.)  Ultimately, as will be discussed in greater detail below, the Magistrate Judge found that Grounds Six through Twelve are without merit.  (*Id.* at PageID#s 9348–53.)

The Court finds as follows.  Given that Hoerig raised Grounds Six through Twelve in her Rule 26(B) application (and Ground Six expressly asserts ineffective assistance of appellate counsel,) Grounds Six through Twelve can reasonably be interpreted to assert sub-grounds for ineffective assistance of appellate counsel.  In fact, the state appellate court considered and rejected Hoerig's Rule 26(B) claims as asserting ineffective assistance of appellate counsel.  Therefore, because Hoerig is a *pro se* litigant and because Hoerig brought these arguments in state court in her Rule 26(B) application, the Court liberally construes Grounds Six through Twelve of Hoerig's Petition as raising

46

grounds for which her appellate counsel was constitutionally ineffective and will address them accordingly, as appropriate where Hoerig has objected.[24]

### a.  Standard

In order to establish ineffective assistance of counsel, a petitioner must demonstrate that her counsel's conduct was so below acceptable standards of representation that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment to the United States Constitution. When addressing a claim of ineffective assistance of counsel, courts apply the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a petitioner to demonstrate that: (1) her counsel's performance was deficient; and (2) the allegedly ineffective assistance resulted in prejudice to the petitioner, meaning that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.  "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*  Moreover, to establish the prejudice component of the *Strickland* standard, a defendant must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lundgren v. Mitchell*, 440 F.3d 754, 799 (6th Cir. 2006) (citations omitted).

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  Mere

---

[24] Hoerig first raises a general Objection that the Magistrate Judge "failed to take the notations and arguments made directly in the exhibits into consideration."  (Doc. No. 82 at PageID# 9842.)  In support of this argument, Hoerig cites Document Number 48, a set of exhibits that Hoerig filed as part of her A-Z box of exhibits.  (*Id.*)  However, as Hoerig herself acknowledges, the exhibits introduce "evidence," and not arguments, across a span of over 600 pages.  (*See generally* Doc. No. 48.)  As noted elsewhere throughout this Memorandum Opinion and Order, the Court is not required to sift through voluminous exhibits to locate Hoerig's arguments or notations in support thereof.  Hoerig must articulate her arguments and present them to the Court in a readily comprehensible form, despite her *pro se* status.  With this principle in mind, the Court turns to Hoerig's Grounds Six through Twelve.

disagreements by a defendant with tactics or strategies employed by counsel are not enough to support a claim of ineffective assistance of counsel and there is a presumption that the challenged conduct of a petitioner's counsel was a matter of strategy.  *Id.* at 689; *see also United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).

The Supreme Court has held a defendant is entitled to effective assistance of counsel in his first appeal as a matter of right.  *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  Thus, the two-part test enunciated in *Strickland* is applicable to claims of ineffective assistance of appellate counsel.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  An appellant has no constitutional right, however, to have every non-frivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750-54 (1983), and tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel.  *Perry*, 908 F.2d at 59.  "[O]nly when issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome."  *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (internal quotation marks and citations omitted).

### b.    Ground Six

In Ground Six, Hoerig argues that her trial counsel (1) failed to challenge the jury venire; (2) failed to subpoena additional witnesses including "expert witnesses"; (3) filed but then withdrew a motion to suppress evidence found in one of Hoerig's automobiles; (4) failed to authenticate evidence, and (5) failed to challenge certain witnesses.  As discussed *supra*, during her state court proceedings, Hoerig only raised these instances of alleged ineffectiveness of trial counsel in her Rule 26(B) Application, i.e., in the context of arguing that her appellate counsel was ineffective for failing to raise her trial counsel's alleged ineffectiveness on direct appeal.

The Magistrate Judge, however, appears to have construed Ground Six as asserting claims of ineffectiveness of trial counsel.  The Magistrate Judge concluded that Hoerig does not offer any argument suggesting that Ohio's presumptively constitutional voter registration lists can be challenged.  (Doc. No. 70 at PageID# 9353.)  The Magistrate Judge further concluded that, as to the remainder of her arguments, Hoerig has "fail[ed] to meaningfully develop these arguments beyond her own self-serving conclusions that they are meritorious."  (*Id.*)  As an example, the Magistrate Judge explained that Hoerig fails to argue what substantive information could have been revealed through "a more vigorous examination" or the "potential impact on the verdict from her [counsel's] alleged errors."  (*Id.*)

Hoerig objects on the single basis that the Magistrate Judge "made a false and conclusory statement" when she concluded that "[Hoerig] wholly fails to argue what substantive information could have been revealed through a more vigorous examination."  (Doc. No. 82 at PageID# 9850.)  Hoerig argues that she "made [this] point very clear," citing to 96 pages from her Traverse.  (*Id.* (citing Doc. No. 55 at PageID#s 8071–8167).)  The remainder of Hoerig's Objections on this point are restatements and reproductions of arguments as to what she believes her trial counsel should have done differently.

In this case, Hoerig does not specifically explain how the Magistrate Judge's conclusion was erroneous.  Hoerig's general citation to 96 pages from her Traverse is insufficient to raise a specific objection to the Magistrate Judge's conclusion.[25]  As mentioned several times throughout this

---

[25] The Court nevertheless observes that the 96-page range includes arguments that Dr. Felo is not an expert and that his opinion was not supported by adequate "scientific bases" such as "fluid dynamics" based upon the alleged lack of "blood splatter," the trajectory of the bullets, and Hoerig's own opinion as to which bullet was fatal. (Doc. No. 55 at PageID#s 8071–8167.)  Hoerig, relying solely on photographs of Karl's body and her own opinions concerning his death, also contends that trial counsel should have hired an expert to opine on a blood pattern, Karl's body position, and "signs of

49

Memorandum Opinion and Order, a petitioner, when filing objections to an R&R, is required to articulate his arguments specifically and clearly such that the District Judge can determine which of the Magistrate Judge's conclusions are purported to be erroneous. Hoerig's failure to explain or cite to any error in the R&R precludes a *de novo* review. The Court finds no clear error with the Magistrate Judge's conclusions that (1) the Ohio jury venire selection process is presumptively constitutional and (2) Hoerig's Petition does not develop any of her other arguments in support of Ground Six. Accordingly, Hoerig's Objections are overruled. Moreover, because Hoerig has failed to demonstrate that the Magistrate Judge incorrectly concluded that trial counsel was ineffective for failing to raise the issues discussed in Ground Six, the Court further finds that Hoerig has failed to show that her appellate counsel was ineffective for failing to raise any of these instances of alleged ineffectiveness of trial counsel on direct appeal. The Court therefore finds that, whether construed as a claim of ineffective assistance of trial counsel or a claim of ineffective assistance of appellate counsel, Ground Six is without merit.

### c.    Ground Seven

In Ground Seven, Hoerig asserts that the state trial court erred and abused its discretion in violation of her speedy trial and due process rights under the Sixth, Fifth, and Fourteenth Amendments when it "denied [Hoerig's] 02-16-2018 and 03-20-2018 motions to dismiss due to speedy trial violation pursuant to O.R.C. 2945.71 without a hearing in its journal entry [dated] 03-

---

stress, pain or suffering." (*Id.*)  Hoerig's arguments in the 96-page range do little more than offer Hoerig's speculative personal theories as to Karl's death in an attempt to challenge the credibility of Dr. Felo's opinions.  Hoerig fails to direct this Court's attention to any authority or evidence in the record to demonstrate what substantive information that could have been revealed if her trial counsel had engaged in more vigorous cross-examination of Dr. Felo or an examination of his own expert, and therefore do not raise a specific objection to the Magistrate Judge's conclusion.

22-2018," "shifted the burden of proof to the Defendant," and "denied [Hoerig] the due process opportunity to defend against" the State's accusations.  (Doc. No. 14-1 at PageID#s 40, 116.)

The Magistrate Judge recommended that Ground Seven be dismissed because Hoerig fails to raise a legal, non-conclusory argument in support of her contention that her speedy trial rights were violated.  (Doc. No. 70 at PageID# 9354.)  Further, the Magistrate Judge explained that Hoerig ignored the state court decision denying her motion to dismiss for speedy trial violations wherein the state court noted that delays in Hoerig's prosecution were attributable to Hoerig's flight to Brazil and refusal to cooperate with extradition proceedings.  (*Id.*)  Lastly, the Magistrate Judge found that Hoerig has not shown that her appellate counsel was deficient for failing to raise this error on appeal. (*Id.*)

In Hoerig's Objections, Hoerig argues that the Magistrate Judge ignored the fact that her trial counsel requested an evidentiary hearing, but that the trial court denied her motion to dismiss for speedy trial violations without the scheduled hearing.  (Doc. No. 82 at PageID# 9856.)  Additionally, Hoerig argues that the Magistrate Judge "regurgitates" and "merely restate[s]" the same conclusory assertions made by the state trial and appellate courts and, seemingly erroneously, relied on the state court's conclusory decision.  (*Id.* at PageID#s 9855–57.)  According to Hoerig, appellate counsel and trial counsel "knew about the existence of exhibits (P–Z) and made no effort to uncover these documents or make arguments."  (*Id.* at PageID# 9855.)  In support of her arguments, Hoerig cites to dozens of exhibits and contends that the Magistrate Judge's determination that the state court "properly" noted that Hoerig's delays were of her own doing is "directly contradicted by the records," for example that she "was willing to go to trial in Brazil as early as 2007" and "was not avoiding prosecution."  (*Id.* at PageID#s 9855, 9857.)  For the following reasons, the Court disagrees.

51

After reciting the standard for evaluating ineffective assistance of appellate counsel claims under *Strickland v. Washington*, 466 U.S. 668 (1984), the state appellate court considered and rejected Hoerig's now-Ground Seven, as follows:

> Here, Hoerig argues that appellate counsel should have challenged the denial of her motion to dismiss for a speedy trial violation. The trial court, in a March 22, 2018 Entry, denied the motion finding that the delay in bringing Hoerig to trial was occasioned by her flight to Brazil, the State made reasonable efforts to secure her extradition, and she opposed those efforts. Hoerig counters that the Trumbull County prosecutor misrepresented the "true facts" of the case in addition to engaging in bribery and conducting a misinformation campaign through the media. As with her prior claim, much of Hoerig's argument rests on evidence outside of the record while the denial of the motion to dismiss was based on documents attached to the State's opposition to dismissal. Accordingly, Hoerig has failed to demonstrate a reasonable probability of success if the appellate counsel had challenged the denial of the motion to dismiss.
>
> It is worth noting at this point that, to be effective, appellate counsel need not raise all possible arguments on appeal. In the exercise of his or her professional judgment, appellate counsel has the discretion to decide which arguments to raise on appeal. *State v. Tenace*, 109 Ohio St.3d 451, 2006-Ohio-2987, 849 N.E.2d 1, ¶7 (appellate counsel need not raise every possible issue in order to render constitutionally effective assistance"); *State v. Ferrell*, 8th Dist. Cuyahoga No. 100659, 2015-Ohio-1446, ¶6 ("the United States Supreme Court has firmly established that appellate counsel possesses the sound discretion to decide which issues are the most fruitful arguments on appeal"), citing *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *State v. Wainwright*, 7th Dist. Mahoning No. 19 MA 0023, 2020-Ohio-4734, ¶7.

(Doc. No. 30-1, Ex. 41 at PageID#s 1902–03.)

As discussed above, before reviewing the substance of the state appellate court's decision, the Court must first determine the proper standard of review. Where the state appellate court, as here, correctly identifies *Strickland* as the standard for assessing a petitioner's ineffective assistance claim, its ruling must unreasonably apply that standard in order for the petitioner to receive habeas relief. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) ("The question is not whether a federal court

believes the state court's determination under *Strickland* was incorrect but whether that determination was unreasonable - a substantially higher threshold.") (internal quotation marks omitted).

For the following reasons, the Court finds that the state appellate court adjudicated what is now Hoerig's Ground Seven on the merits and, therefore, its decision is entitled to deference under the AEDPA.  The state appellate court properly recited the governing standard of review for ineffective assistance of counsel claims set forth in *Strickland*, *supra*, and expressly acknowledged Hoerig's claim that her appellate counsel should have challenged on direct appeal the trial court's denial of her motion to dismiss for a speedy trial violation.  (Doc. No. 30-1, Ex. 41 at PageID# 1161.) The state appellate court then evaluated the record evidence and rejected Hoerig's claim, holding that "much of Hoerig's argument rests on evidence outside of the record while the denial of the motion to dismiss was based on documents attached to the State's opposition to dismissal." (*Id.*)  Although the state appellate court's analysis is somewhat brief, the Court finds it sufficient to constitute an "adjudication on the merits" for purposes of review under Section 2254(d).  Therefore, the inquiry at this juncture is whether the state appellate court's disposition of Hoerig's ineffective assistance of appellate counsel claim was an unreasonable application of clearly established federal law (28 U.S.C. § 2254(d)(1)); or based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding (28 U.S.C. § 2254(d)(2)).  For the following reasons, the Court finds that it was not.

The record shows that, in the trial court, on February 1, 2018, nearly ten years after the indictment was issued against Hoerig and after she had traveled to Brazil and was subsequently extradited back to the United States, the State filed a motion to determine speedy trial calculation and trial date.  (Doc. No. 30-1, Ex. 6.)  On February 16, 2018, Hoerig, through counsel, filed a response

and motion to dismiss for lack of speedy trial.  (Doc. No. 30-1, Exs. 7, 9.)[26]  Hoerig argued that Ohio Revised Code 2945.71(C)(2) applied, which provides that a felony defendant "shall be brought to trial within two hundred and seventy days after the person's arrest."  (*Id.*, Ex. 7 at PageID# 1235.)  The State, in filing its opposition to dismissal, attached numerous documents from Interpol and Brazilian judicial authorities (in Portuguese) in an attempt to establish that Hoerig fled the United States to Brazil after she killed Karl and refused to return until she was arrested and extradited.  (*See generally id.*, Ex. 8.)

On March 22, 2018, the trial court denied Hoerig's motion to dismiss for lack of speedy trial.  (Doc. No. 30-1, Ex. 10 at PageID#s 1438–42.)  The trial court acknowledged that, because Hoerig was arrested in Brazil in April 2016 for extradition to the United States and "continued to fight the extradition process during her incarceration in Brazil for 645 days," Hoerig had "[t]echnically" established a prima facie case of a speedy trial violation."  (*Id.* at PageID# 1439.)  The trial court, however, observed that while the burden then shifted to the State, the State could still rebut the presumption that the delay was unreasonable.  (*Id.*)

The trial court concluded that the delay between Hoerig's indictment, arrest, and trial proceedings was "attributable solely to [Hoerig]."  (*Id.* at PageID# 1440.)  According to the trial court, while she was in Brazil, Hoerig "opposed [her] extradition" to the United States.  (*Id.*)  Meanwhile, the State had demonstrated that it "zealously pursued each and every opportunity" for Hoerig's extradition beginning "almost immediately" after Karl's murder.  (*Id.* at PageID#s 1440–41.)  And the trial court observed that, in the extradition context, speedy trial requirements do not

---

[26] Hoerig filed an initial Response/Motion for Discharge, followed by a "Supplement" to her Response/Motion for Discharge.  (Doc. No. 30-1, Exs. 7, 9.)

commence "until the defendant is in Ohio and arrested on an Ohio charge."  (*Id.* at PageID# 1440.)

Therefore, because Hoerig's significant delay was solely attributable to her own actions, the State

had met its burden of demonstrating that the delay was not unreasonable.

The Court concludes that the state appellate court's decision was neither an unreasonable

determination of the facts nor contrary to, or an unreasonable application of, clearly established

federal law.  As the state appellate court noted, Hoerig's Rule 26(B) argument relied on evidence

outside of the record established in the trial court.  (Doc. No. 30-1, Ex. 41 at PageID# 1902.)

Specifically, the state appellate court had noted earlier in its opinion that "the effectiveness of

appellate counsel cannot be judged on matter not present in the record."  (*Id., Ex.* 41 at PageID# 1901

(citing *State v. Moore*, 758 N.E.2d 1130 (Ohio 2001)).)  Thus, under Ohio law, only evidence that is

part of the record can be considered in evaluating an ineffective assistance of appellate counsel claim

under *Strickland.  See Smith v. Warden*, 2023 WL 8718836, at *16 (S.D. Ohio Dec. 18, 2023).  After

a review of the evidence before the trial court and Hoerig's Rule 26(B) application, the Court agrees

that Hoerig's argument on this ground relied on evidence that was not before the trial court in its

review of Hoerig's motion to dismiss, such as newspaper clippings, congressional acts, and otherwise.

(Doc. No. 30-1 at Exs 8, 40.)  Therefore, Hoerig provided no proper evidence in her Rule 26(B)

application to demonstrate that appellate counsel should have challenged the trial court's denial of

her motion to dismiss and accordingly could not demonstrate that appellate counsel's assistance was

ineffective in failing to do so.  (*Id.*)  Accordingly, the Court finds that it was not unreasonable for the

state appellate court to conclude that appellate counsel was not ineffective for declining to argue, on

direct appeal, that the trial court improperly denied Hoerig's motion to dismiss for lack of a speedy trial.[27]

Hoerig's arguments to the contrary are without merit.  Liberally construing Hoerig's *pro se* pleadings, it appears that Hoerig is generally asserting that the trial court violated her rights when it denied her motions to dismiss "without a hearing," the trial court "shifted the burden of proof" onto her, the Magistrate Judge did not consider trial counsel's evidentiary hearing request, and that, contrary to the state trial court's conclusion, the delay was not of her own doing.  (Doc. No. 14-1 at PageID# 116; Doc. No. 82 at PageID#s 9855, 9857.)  The Court rejects these arguments.

First, there is no clear constitutional right to an evidentiary hearing under Ohio Revised Code § 2945.71 or the Sixth Amendment, and Hoerig has not provided authority otherwise.  And Hoerig does not contend that, once a hearing was set on her motions to dismiss, the trial court erred by ruling on the motions beforehand.  As indicated above, the trial court received full briefing, and Hoerig was even permitted to submit a supplement to her first motion to dismiss.  Further, that Hoerig was able to fully brief her motions to dismiss and respond to the State's motion to calculate speedy trial weighs against Hoerig's assertion that the state court denied her the opportunity to defend against the State's accusations.  Hoerig does not specifically explain how the lack of a hearing on her motions deprived her of due process.  This argument is rejected.

---

[27] The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.  When a habeas petitioner alleges a violation based on a speedy trial claim, he must show that, on balance, he was deprived of a speedy trial based on the following relevant factors: "the length of the delay, the reason for the delay, the defendant's diligence in asserting the right, and whether the delay prejudiced the defendant." *Gaston v. Fender*, 2024 U.S. App. LEXIS 2616, at *5 (6th Cir. Feb. 5, 2024) (citing *Barker v. Wingo*, 407 U.S. 514, 522 (1972)).  In Ohio, "a criminal defendant's state and federal constitutional speedy-trial rights are codified in Ohio Revised Code § 2945.71 *et seq*." *Id.*  Specifically, Section 2945.71 provides that a felony defendant must be tried within 270 days of his arrest.  Ohio Rev. Code § 2945.71.

Second, the trial court also expressly noted that Hoerig had *satisfied* her burden of establishing a prima facie case.  (Doc. No. 30-1, Ex. 10 at PageID# 1439.)  The trial court recognized that the burden thereafter shifted to the State.  (*Id.*)  Finally, the trial court concluded that the State had met its burden of showing that the delay was not unreasonable given Hoerig's own conduct.  (*Id.* at PageID#s 1439–41.)  Hoerig's Petition includes little more than a conclusory allegation that the trial court "shifted the burden of proof to [Hoerig]," and accordingly cannot demonstrate that appellate counsel should have challenged her conviction on this basis.  (Doc. No. 14-2 at PageID# 116.)  This argument is rejected.

Third, Hoerig fails to explain how her appellate counsel should have challenged the motion to dismiss on direct appeal other than to say without explanation that the State's exhibits were "fraudulent exhibits" and that she was willing to go to trial in Brazil in 2007.  (Doc. No. 82 at PageID# 9857.)  This argument is also rejected.[28]

Further, even assuming *arguendo* that a challenge to the trial court's ruling on direct appeal would not have been frivolous, as the Sixth Circuit has explained and the state appellate court observed, the "'[a]ppellate counsel need not raise every non-frivolous claim on direct appeal.'"

---

[28] Hoerig appears to imply that appellate and trial counsel should have "uncovered" or made arguments based on exhibits (P–Z), but that implied argument is without merit.  Hoerig appears to be referring to her "supplemental exhibits" bearing the markings of P through Z, which she filed as part of her "box of exhibits" that she had physically filed with the Youngstown courthouse.  (Doc. No. 82 at PageID# 9855.)  These exhibits span nearly a dozen separate docket entries and encompass almost 1,200 pages of "exhibits."  (*See* Doc. Nos. 32, 35–44.)  Hoerig elsewhere cites a supplemental exhibit bearing the label of "J," another 600-page filing from Hoerig's box of exhibits.  (Doc. No. 82 at PageID#s 9855, 9857.)  Not only are Hoerig's citations to such a large range unacceptable, but Hoerig fails to specify or explain how these exhibits "directly contradict" the Magistrate Judge's findings and conclusions.  As noted elsewhere throughout this Memorandum Opinion and Order, Hoerig must, even as a *pro se* litigant, draw the connection between the exhibits she cites and the arguments and positions for which she cites them.  Hoerig's conclusory allegation that the Magistrate Judge "got it wrong" based on thousands of pages of exhibits is insufficient to demonstrate that she is entitled to habeas relief.  As a result, Hoerig has not shown that appellate counsel was unreasonable in not challenging her conviction on this ground on direct appeal.

*Sanders v. Curtin*, 529 F. App'x 506, 521 (6th Cir. 2013).  Indeed, "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."  *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).  *See also Hand v. Houk*, 871 F.3d 390, 410 (6th Cir. 2017).  Hoerig has not shown that any of her proposed arguments were clearly stronger than the five grounds appellate counsel raised on direct appeal.

The Court therefore finds that Hoerig's Speedy Trial Clause and due process claims as set forth in Ground Seven are meritless.  Accordingly, Hoerig's Objection is overruled and Ground Seven is dismissed.

### d.    Ground Eight

In Ground Eight, Hoerig asserts that the state trial court erred and abused its discretion in violation of her rights to due process and confrontation under the Fifth, Sixth, and Fourteenth Amendments when it "denied [Hoerig's] motion for a change of venue without a hearing."  (Doc. No. 14-1 at PageID# 40.)  In support of this contention, Hoerig asserts that the trial court "took nine months to rule on the motion" and released a film to the media which "misconstrued [her] confession to the police," and that the prosecutor utilized media outlets for "12 years" resulting in prejudice and "disruptive influences in the courtroom."  (*Id.*)  Hoerig also cites as evidence of prejudice the fact that the jury reached a verdict within "only one hour" when her DVD deposition was three hours long.  (*Id.*)  Combined with Hoerig's "difficult to understand foreign accent," Hoerig maintains that the jury would have been required to "watch her DVD at least once during deliberation."  (*Id.*)

The Magistrate Judge recommended that Ground Eight be dismissed because Hoerig has not shown that the state court's denial of her motion to change venue based on jury bias was erroneous

58

because the jury was actually prejudiced.  (Doc. No. 70 at PageID# 9354.)  The Magistrate Judge observed that Hoerig's reliance on newspaper articles is misplaced.  (*Id.*)  According to the Magistrate Judge, even if the articles resulted in some prejudice, Hoerig has not shown that the trial court's individual voir dire and subsequent conclusion that media coverage did not prejudice the jury was erroneous.  (*Id.*)  Lastly, the Magistrate Judge concluded that because Hoerig has not shown that she suffered prejudice from the state court's decision, she has also failed to show that her appellate counsel's assistance was ineffective for not raising the argument that trial counsel should have raised it on direct appeal.  (*Id.* at PageID#s 9354–55.)

Hoerig objects to the Magistrate Judge's conclusion that she failed to show that the jury was prejudiced and therefore that the state trial court should have granted her motion to change venue by referencing the "thousands of records" and "abundant arguments" and authorities she has provided, "which the Magistrate [Judge] insists in ignoring." (Doc. No. 82 at PageID#s 9861–63.)[29]  According to Hoerig, the Magistrate Judge "mocks the newspaper articles," which she contends are a "legitimate tool" for demonstrating the "extent of media coverage." (*Id.* at PageID# 9862.)  Hoerig further asserts that the Magistrate Judge "ignores the fact that voir dire alone cannot conclusively guarantee jury impartiality." (*Id.*)  She then refers to her argument that the jury's consideration of her three-hour deposition in under an hour, the police's statement that her verdict would take a couple of hours, and that one of the jurors was a nephew of a witness as evidence that the jury was partial. (*Id.* at PageID#

---

[29] Hoerig also takes issue with the Magistrate Judge's "frivolous obstacles for filing evidence and for receiving Court documents," pointing only to the Magistrate Judge's refusal to scan her box of exhibits into PACER.  (Doc. No. 82 at PageID# 9862.)  This objection is meritless.  Not only does Hoerig not explain how the box of exhibits not being canned into PACER results in Hoerig's failure to demonstrate prejudice by her appellate counsel's alleged failures, but Hoerig's box of exhibits are *her own*.  In other words, if Hoerig decided that her box of exhibits was necessary to present her case, she could have (and did in many instances) provide and cite to her exhibits in her Petition and Traverse.

9863.)   Lastly, Hoerig re-asserts her contention that Grounds Seven, Eight, and Twelve are all

"intertwined" concerning her political interference and bribery claims.  (*Id.* at PageID#s 9836–64.)

For the following reasons, the Court disagrees.

Applying *Strickland*'s standard, the state appellate court considered and rejected what is now

Hoerig's Ground Eight, as follows:

> To prevail on a claim for change of venue, the defendant, in "certain rare cases," may show "that pretrial publicity was so pervasive and prejudicial that an attempt to seat a jury would be a vain act," otherwise the defendant must show "that one or more jurors were actually biased against him [or her]." *State v. Martin*, 151 St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶30 and 44.

> Hoerig presented no evidence that any juror was actually biased against her. She did attach to her petition numerous documents attesting the pretrial publicity her case received, although it is uncertain whether these documents were properly part of the record on appeal. In either case, it cannot be said that the failure to challenge venue on appeal amounted to professional negligence by appellate counsel or, if such challenge were raised, that there would have been a reasonable probability of success. Even under the most extreme circumstances, "pretrial publicity *** does not inevitably lead to an unfair trial. (Citation omitted.) *State v. Mammone,* 139 Ohio St.3d 467, 2014-Ohio-1942, 19 N.E.2d 1051, ¶4. Hoerig notes that after a trial lasting several days, the Jury returned its verdict within three hours [FN 1] thus suggesting that it had been predisposed by pretrial publicity to find her guilty. In contrast to this possible inference, Hoerig's attachments also state that the majority of the potential jurors "knew little about the case - most only recalling tidbits or headlines."

> FN 1 -- Although Hoerig claims the jury returned its verdict in under an hour, the article attached to her Application stated the verdict was returned in under three hours.

(Doc. No. 30-1, Ex. 41 at PageID#s 1903–04.)

As noted above, before reviewing the substance of the state appellate court's decision, the

Court must first determine the proper standard of review.  In this case, the state appellate court

adjudicated what is now Hoerig's Ground Eight on the merits, and therefore, its decision is entitled

to deference under the AEDPA.  The state appellate court properly applied *Strickland*, as set forth

above, and expressly acknowledged Hoerig's claim that her appellate counsel was ineffective for

failing to argue, on direct appeal, that the trial court erroneously denied her motion to change venue because of jury bias.  (*See id.*)  The state appellate court then evaluated Hoerig's Rule 26(B) application and rejected Hoerig's claim, finding that, while she did attach documents indicating that her case gained pretrial publicity, she had not presented any evidence of juror bias as required.  (*Id.* at PageID# 1904.)  And further, according to the state appellate court, Hoerig's own attachments indicated that the "majority of the potential jurors knew little about the case," with "most only recalling tidbits or headlines."  (*Id.* (quotation marks omitted).)  The Court finds that the state appellate court's analysis is sufficient to constitute an adjudication on the merits for purposes of Section 2254(a).  Therefore, the Court will apply AEDPA deference to the state appellate court's resolution of what is now Hoerig's Ground Eight.  Accordingly, the proper inquiry is whether the state appellate court's disposition of Hoerig's ineffective assistance of appellate counsel claim was an unreasonable application of clearly established federal law (28 U.S.C. § 2254(d)(1)); or based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding (28 U.S.C. § 2254(d)(2)).

The Court concludes that the state appellate court's decision was neither an unreasonable determination of the facts nor contrary to, or an unreasonable application of, clearly established federal law.  As the state appellate court noted, Hoerig failed to demonstrate that any given juror was biased.  (Doc. No. 30-1, Ex. 41 at PageID# 1904.)  Instead, Hoerig's arguments and exhibits in support thereof on her motion to change venue before the trial court in her Rule 26(B) application only indicate that the murder, investigation, and charges related thereto were publicized.  (Doc. No. 30-1 Exs. 22, 41.)  "Extensive media coverage and knowledge within the community of the crimes and of the defendant are insufficient by themselves to create a presumption that a defendant was

61

denied a fair trial." *Aguilar v. Chapman*, 2020 WL 6703193, at *3 (6th Cir. Sept. 22, 2020) (citing *Dobbert v. Florida*, 432 U.S. 282, 303 (1977)).  Thus, as the state appellate court noted, a "defendant claiming that pretrial publicity has denied him a fair trial must ordinarily show that one or more jurors were actually biased" against him.  *Roberts v. Baldauf*, 2023 WL 5229816, at *44 (N.D. Ohio Aug. 15, 2023) (citing *State v. Treesh*, 739 N.E.2d 749 (Ohio 2001)); *see also Nebr. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976) (Doc. No. 30-1, Ex. 41 at PageID# 1903 (citing *State v. Martin*, 90 N.E.3d 875 (Ohio 2017)).  Utilizing this standard, the state appellate court concluded that Hoerig had failed to show that any juror was actually biased against her.  (Doc. No. 30-1 Ex. 41.)

While Hoerig references newspaper articles and television news stories, Hoerig does not specifically cite to any evidence showing that the members of the jury were aware of her then-10-year-old murder case.  However, even assuming *arguendo* that the "community" from which Hoerig's jury was selected was already aware of the general allegations against her, Hoerig does not demonstrate or point to any evidence that would show that any publicity was "massive, pervasive, and prejudicial."  (Doc. No. 14-2 at PageID# 188–90.)  Hoerig's support for this proposition appears to lie in her allegation that the jury must have been biased because the jury apparently did not watch the entirety of her three-hour-long DVD deposition, and one of the jurors was a nephew of one of the witnesses.  (Doc. No. 82 at PageID#s 9863–64.)  But the state appellate court observed in a footnote that the verdict was reached in less than three hours.  (Doc. No. 30-1, Ex. 41 at PageID# 1904.)  Hoerig did not provide in her Rule 26(B) application any evidence to the contrary.

To substantiate her claim of jury bias, Hoerig needed to show that the jury was actually biased against her.  Because Hoerig failed to do this in her Rule 26(B) application, Hoerig could not have shown that her appellate counsel prejudiced her by failing to argue on direct appeal that the trial court

erred in denying her motion to change venue due to jury bias.  Therefore, Court concludes that the state appellate court was not unreasonable in refusing to find that her appellate counsel was ineffective on this ground.  Again, Hoerig provided no evidence in her Rule 26(B) application that would demonstrate that an argument on direct appeal that her motion to change venue should have been granted because the jury was biased would have succeeded.

Hoerig's arguments to the contrary are without merit.  Specifically, Hoerig cites no legal authority to support her argument that the trial court taking nine months to rule on her motion to change venue or that doing so without a hearing violated her constitutional rights.  Similarly, Hoerig does not direct the Court's attention to any evidence in the record that the police "knew" that the verdict would only take a couple of hours or indicate which juror was related to which witness.  As to the supposed bribery, it is unclear how the bribing of Brazilian authorities in extraditing Hoerig to the United States would result in juror bias.[30]

Hoerig's appellate counsel raised five arguments on appeal.  Because Hoerig fails to show that any of her suggested arguments were clearly stronger and should have been raised on direct appeal, to demonstrate that appellate counsel's failure to do so resulted in prejudice, or otherwise elaborate on her arguments, Hoerig has not established that her appellate counsel's conduct was unreasonable and prejudicial in failing to raise these arguments.  Accordingly, Hoerig's objections to the Magistrate Judge's R&R are overruled, and Ground Eight is dismissed.

### e.    Grounds Nine and Ten

---

[30] Further, it is unclear as to whom or which witness Hoerig would have wanted to confront under the Confrontation Clause, as the arguments she presents as to Ground Eight generally concern jury tainting and bias, not the allegations or testimony of a given witness.  (Doc. No. 14-2 at PageID# 188.)  And furthermore, Hoerig was present and had trial counsel for each witness the State presented, so it is not apparent that she was deprived of the ability to confront any witness.

63

In Grounds Nine and Ten, Hoerig asserts that she was deprived of her rights to a fair trial, due process, and confrontation under the Fifth, Sixth, and Fourteenth Amendments when the prosecutor engaged in prosecutorial misconduct by "fail[ing] to correct knowingly false testimony" and "fail[ing] to disclose exculpatory evidence."  (Doc. No. 14-1 at PageID#s 40–41.)  Hoerig asserts that the prosecutor knew that Dr. Felo's testimony "was false" in violation of his *Napue* obligations when the prosecutor "knew that Karl died instantly from the gunshot 'B' and not 'A'," and allowed Detective Yannucci "to deny on the stand that," during his interview of Hoerig, "he said that the suicide device was the State's theory."  (*Id.* at PageID#s 245–46.)  Additionally, Hoerig appears to contend that the prosecutor violated his *Brady* obligations by deleting a portion of "the DVD."  (*Id.* at PageID# 262.)  Hoerig also asserts that her trial counsel provided ineffective assistance when he "failed to challenge [the] prejudicial false testimony."  (*Id.* at PageID# 40.)  Hoerig also makes a number of arguments that are not related to *Napue* or *Brady*, for example, that the trial and appellate courts "failed to consider the entire record."  (*Id.* at PageID# 262.)

The Magistrate Judge recommended that Grounds Nine and Ten be dismissed because Hoerig has failed to demonstrate that any testimony was false or that any exculpatory evidence was withheld from her.  (Doc. No. 70 at PageID# 9355.)  According to the Magistrate Judge, Hoerig only makes conclusory assertions that the prosecutor utilized false testimony in violation of *Napue* or violated its *Brady* obligations.  (*Id.*)  Therefore, Hoerig has not shown that her trial counsel's assistance was ineffective by not objecting to false testimony, or that her appellate counsel's assistance was ineffective by failing to raise an ineffective assistance of trial counsel claim on these grounds.  (*Id.*)

In her Objections, Hoerig groups together her Objections to Grounds Nine and Ten and characterizes her case as involving "fraud on the courts and fraud by the courts," but spends the

majority of her discussion imploring the Court to "look at each exhibit to find the arguments written in the exhibit," which she admits "many times consist of notations and arguments made in the exhibit itself."  (Doc. No. 82 at PageID# 9867.)  At one point, Hoerig argues that the Magistrate Judge's conclusion contradicts the state court records and her "prima facie evidence that the documentation produced by [the] prosecutor" was "false, fraudulent, perjured," and violated the United States-Brazil extradition treaty.  (*Id.* at PageID# 9858.)  Hoerig points to the testimony of various witnesses as purported false or impermissible testimony, as well as to the prosecutor's "misstat[ing] of material evidence at trial" and "personal attacks" on Hoerig that affected the jury's view of her trial counsel's entire defense.  (*Id.* at PageID#s 9741, 9770, 9782–83.)  Hoerig lastly references an "index" she provided after the Magistrate Judge issued her R&R that purportedly "outlines and demonstrates the material that was withheld from [Hoerig] . . . and the false testimonies that prosecutor failed to correct."  (*Id.* at PageID# 9869.)  For the following reasons, the Court disagrees.

Applying *Strickland*, the state appellate court considered and rejected what is now Hoerig's Ground Nine, as follows:

> Under this proposed assignment of error, Hoerig claims appellate counsel was deficient for not assigning as error trial counsel's failure to object to the use of false evidence to obtain her conviction pursuant to *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.3d 12–17 (1959). The statements cited by Hoerig are not testimonial, but statements made by the prosecutor during closing argument. Even taken as instances of prosecutorial misconduct (and presuming their falsity), the statements were inconsequential and immaterial to the issue of Hoerig's guilt. [FN 2]
>
> FN 2 -- Hoerig cited the following statements by the prosecutor without explaining their significance: "the thing inside of me"; "they have the death penalty"; and "she even said in the interview with Detective Yannucci something about she had to grab a pen - and she sort of jokingly said, 'oh, yeah, I might kill myself with that.'"

(Doc. No. 30-1, Ex. 41 at PageID# 1904.)

Again, applying *Strickland*, the state appellate court also considered and rejected what is now Hoerig's Ground Ten, as follows:

> Hoerig maintains that exculpatory Brady material was omitted from the record, including audio recordings, computer records, and the victim's shoe. These claims fail to demonstrate that appellate counsel was ineffective. As noted above, counsel cannot be found ineffective based on material that is not part of the record.

(*Id.* at PageID#s 1904–05.)

As noted above, before reviewing the substance of the state appellate court's decision, the Court must first determine the proper standard of review.  In this case, the state appellate court adjudicated what are now Hoerig's Grounds Nine and Ten on the merits, and therefore, its decision is entitled to deference under the AEDPA.  The state appellate court properly applied *Strickland*, as set forth above, and expressly acknowledged that Hoerig's Ground Nine, finding that the statements Hoerig argued were "false evidence" were not testimonial, were made by the prosecutor during closing arguments, and were nonetheless inconsequential and immaterial to Hoerig's guilt.  (*See id.* at PageID# 1904.)  As to Ground Ten, the state appellate court found that the allegedly exculpatory materials omitted from the record were audio recordings, computer records, and Karl's shoe, which could not be considered in its Rule 26(B) review of Hoerig's ineffective assistance of appellate counsel claim.  The Court finds that the state appellate court's analysis of Grounds Nine and Ten, while brief, is sufficient to constitute an adjudication on the merits for purposes of Section 2254(a). Therefore, the Court will apply AEDPA deference to the state appellate court's resolution of these Grounds.  Accordingly, the proper inquiry is whether the state appellate court's disposition of Hoerig's ineffective assistance of appellate counsel claim was an unreasonable application of clearly established federal law (28 U.S.C. § 2254(d)(1)); or based on an unreasonable determination of the

66

facts in light of the evidence presented in the State court proceeding (28 U.S.C. § 2254(d)(2)).  For the following reasons, the Court finds that it was not.

The trial transcript indicates that, during closing arguments, the State prosecutor stated as follows:

> MR. BECKER: [Hoerig] referred to the baby as "the thing inside me."
>
> . . .
>
> MR. BECKER: And then [Hoerig's family] tell[s] her, "Oh, you have to get out of Ohio. They have the death penalty."
>
> . . .
>
> MR. BECKER: [Hoerig] even said at one point in the interview with Detective Yannucci something about -- he had to grab a pen -- and she sort of jokingly said, "Oh, yeah, I might kill myself with that."

(Doc. No. 30-2 at Tr. 1204, 1205, 1210.)

Under *Napue*, a "State may not knowingly use false evidence, including false testimony to obtain a tainted conviction."  360 U.S. 264, 269 (1959).  "To prove that the prosecutor's failure to correct false testimony violated due process rights, a petitioner must demonstrate that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false."  *Rosencrantz v. Lafler*, 568 F.3d 577, 583–84 (6th Cir. 2009) (citations omitted).  "The *Napue* standard is very similar to the *Brady* standard: '[a] false statement is material under this standard, and a new trial is required, if the false testimony could in any reasonable likelihood have affected the judgment of the jury.'"  *McNeill v. Bagley*, 10 F.4th 588, 604 (6th Cir. 2021) (quoting *Brooks v. Tennessee*, 626 F.3d 878, 895 (6th Cir. 2010)).

In this case, as to Ground Nine, the Court concludes that the state appellate court's decision was neither an unreasonable determination of the facts nor contrary to, or an unreasonable application

67

of, clearly established federal law.  The state appellate court observed that the prosecutor's asserted statements were not testimonial, and therefore not evidence, but rather part of the prosecutor's closing arguments.  (Doc. No. 30-1, Ex. 41 at PageID#s 1904–05.)  Upon review of Hoerig's Rule 26(B) application, the state appellate court was correct in summarizing that Hoerig only identified statements, and not evidence, made by the prosecutor during closing arguments.  (*See* Doc. No. 30-1, Ex. 38 at PageID# 1775 (citing Doc. No. 30-2 at Tr. 1204, 2305, 1210).)  In fact, the trial court instructed the jury that "[w]hat the attorneys are saying in closing is not evidence."  (Doc. No. 30-2 at Tr. 1230.)  To assert a *Napue* claim on habeas review, Hoerig must have pointed to false *evidence*. *Napue*, 360 U.S. at 269.  Hoerig does not argue or show that the prosecutor introduced false evidence or testimony that prejudiced her, and therefore, she has not demonstrated that her appellate counsel unreasonably failed to raise this argument on direct appeal.  Accordingly, the Court finds that the state appellate court was not unreasonable in concluding that Hoerig's appellate counsel was not ineffective for declining to argue, on direct appeal, that the prosecutor engaged in misconduct by eliciting false testimony in violation of *Napue.*

The Court also rejects Hoerig's contentions that the testimony of Ron Lane, Krista Bridges, Detective Pizzulo, and Detective Yannucci was false and can support a *Napue* claim in Ground Nine. (Doc. No. 82 at PageID# 9741.)  In her Rule 26(B) application, Hoerig did not mention these individuals or their testimony.  (Doc. No. 30-1, Ex. 38 at PageID# 1775.)  "It is well-established that the factual and legal bases for a habeas claim must be the same as those presented to the state courts." *Butcher v. Phillips*, 2022 WL 20476927, at *11 n.1, *report and recommendation adopted*, 2023 WL 5046186 (N.D. Ohio Aug. 8, 2023) (citing *Williams v. Bagley*, 380 F.3d 932, 969 (6th Cir. 2004)).

Hoerig can no longer raise these arguments in state court.  Accordingly, Hoerig has procedurally defaulted her claims as to Ground Nine concerning these individuals' testimony.

Additionally, even if Hoerig had properly raised these arguments in her Rule 26(B) application, she has failed to explain or demonstrate that the prosecutor knew that any part of these individuals' testimony was false.  *King v. Braman*, 2022 WL 3973081, at *3 (6th Cir. Apr. 15, 2022) (holding that even if witness's testimony "was inconsistent," defendant's false testimony claim fails because he "did not show that . . . the prosecutor knew it was false").  Specifically, as to Mr. Lane and Ms. Bridges's testimony, Hoerig does not provide specific citations to evidence demonstrating that the testimony of either was false.  And as to the testimony of Detectives Pizzulo and Yannucci, Hoerig only cites case law and does not discuss what portion of Detective Pizzulo's testimony was false, and does not point to any specific piece of false testimony from Detective Yannucci other than to say that he stated that "the suicide device was the State's theory" in her Petition.  (Doc. No. 14-3 at PageID#s 245–46; Doc. No. 82 at PageID#s 9741–43.)  Because Hoerig does not develop these arguments or provide evidence that the prosecutor knew that any testimony was false, Hoerig has not demonstrated that her appellate counsel should have raised them on direct appeal.[31]

Because Hoerig has failed to show that any witness's testimony was false, or that the prosecutor was aware of any such false testimony, Hoerig has not shown that her appellate counsel

---

[31] In addition, Hoerig argues that Mr. Lane's testimony "is not convincing evidence of premeditation, and only corroborates [Hoerig's] version of the events," which "supports an acquittal" based on manifest weight of the evidence. (Doc. No. 82 at PageID# 9741.)  Hoerig also posits that the testimony of Chappell and Jester are not convincing evidence and instead support an acquittal on manifest weight of the evidence. (*Id.* at PageID#s 9744–45).  Lastly, Hoerig challenges whether Dr. Felo's testimony is permissible or scientific.  (*Id.* at PageID# 9744.)  As discussed above, claims based on the credibility of witnesses or the manifest weight of the evidence are not cognizable on federal habeas review. Accordingly, these arguments, even if properly presented before the Court, do not establish cognizable claims for relief.

69

was ineffective for failing to raise these issues on direct appeal.  Accordingly, Ground Nine is dismissed.

As to Ground Ten, the Court also concludes that the state appellate court's decision was neither an unreasonable determination of the facts nor contrary to, or an unreasonable application of, clearly established federal law.  As the state appellate court correctly noted, Hoerig only argued in her Rule 26(B) application that "the shoe," the "audio recordings," and the "computer records," were exculpatory, and that the prosecutor "tampered" with evidence by deleting a portion of her DVD. (Doc. No. 30-1, Ex. 38 at PageID# 1775.)  As this Court has previously noted, the state appellate acknowledged that "the effectiveness of appellate counsel cannot be judged on matter not present in the record."  (*Id.*, *Ex.* 41 at PageID# 1901 (citing *State v. Moore*, 758 N.E.2d 1130 (Ohio 2001)).)  As concluded above, under Ohio law, Hoerig could not, in her Rule 26(B) application, rely on evidence that was not part of the record in asserting an ineffective assistance of counsel claim.  *See State v. Wilburn*, -- N.E.3d --, 2023 WL 9097522, at *8 (Ohio App. 4th Dist. Dec. 21, 2023) (rejecting claim that counsel was ineffective by failing to raise *Brady* violation because "none of the evidence underlying these allegations appears in the trial court record").  Thus, because appellate counsel could not have successfully raised this claim on direct appeal, the Court holds that the state appellate court did not unreasonably conclude that appellate counsel was not ineffective for failing to do so.

Lastly, the Court notes that Hoerig's Objections give no insight as to how her speedy trial (Ground Seven) or change of venue motions (Ground Eight) or her extradition treaty arguments (Ground Twelve) are "intertwined" with or "related to" the prosecutor's obligation under *Brady* to disclose exculpatory evidence.  (Doc. No. 82 at PageID# 9869.)  Hoerig does not explain what exculpatory evidence the prosecutor knew about but failed to disclose.  Additionally, Hoerig, without

pointing to any specific evidence, argues that Exhibits P through Z from her box of exhibits supports her *Brady* claim.  (*Id.* at PageID# 9866.)  As noted above, these exhibits encompass over a thousand pages which Hoerig expects the Court to sift through to identify her arguments.  The Court will not—and is not required to—locate Hoerig's arguments for her.[32]

Because Hoerig has not demonstrated that appellate counsel should have raised *Napue* or *Brady* violations on direct appeal, or that any such argument are clearly stronger than the arguments appellate counsel did raise, the Court concludes that the state appellate court was not unreasonable in failing to conclude that appellate counsel was ineffective for not raising these arguments. Accordingly, Hoerig's Objections to the Magistrate Judge's R&R as to Grounds Nine and Ten are overruled, and Grounds Nine and Ten are dismissed.

### f.      Ground Eleven

In Ground Eleven, Hoerig asserts that she was deprived of her due process rights under the Fifth, Sixth, and Fourteenth Amendments, and that the Excessive Fine Clause of the Eighth Amendment was also violated, when the state trial court set bail "in the amount of $10,000,000.00 (cash in full) and the docket sheet showed a different amount."  (Doc. No. 14-1 at PageID# 41.)

The Magistrate Judge recommended that Ground Eleven be dismissed because a claim by a convicted prisoner that the trial court imposed excessive bail is not cognizable under Section 2254.

---

[32] In an argument tangentially related to Grounds Nine or Ten, Hoerig also appears to assert error based on the prosecutor's "misstat[ing of] material evidence at trial" and "personal attacks" against her.  (Doc. No. 82 at PageID# 9782.)  However, this argument was not clearly raised in Hoerig's Petition, and Hoerig does not explain what "personal attacks" were made against her or how the prosecutor "misstated material evidence" other than to say that the prosecutor "shut down" her only defense of manslaughter in his opening arguments and mentioned that she spent ten years in Brazil after she killed her husband, which "does not establish premeditation."  (*Id.* at PageID# 9781.)  These arguments are conclusory.  Hoerig fails to explain how the prosecutor's comments prejudiced her in any way, much less that appellate counsel should have raised this issue on direct appeal.  Accordingly, Hoerig's argument on this basis fails.

(Doc. No. 70 at PageID# 9355.)  Because Hoerig is no longer in custody due to a pre-conviction bail bond and is instead in custody for the sentence she received for her aggravated murder conviction, Hoerig has no habeas claim concerning her pre-conviction bail.  (*Id.*)

Hoerig does not raise a specific objection to the Magistrate Judge's conclusion that her claim is not cognizable on federal habeas review.  (*See generally* Doc. No. 82.)  Additionally, Hoerig does not explain how appellate counsel's failure to raise the excessive bail argument would be unreasonable or demonstrate such a failure it would have prejudiced her in her trial proceedings.  (*See id.*)  As with many of Hoerig's other "Objections," Hoerig only re-argues the merits of her Grounds for Relief and does not direct the Court's attention to a specific determination by the Magistrate Judge concerning Ground Eleven.

The Court finds no clear error with the Magistrate Judge's recommendation.  *See Contreras v. Bouchard*, 2023 WL 7924708, at *2 (E.D. Mich. Nov. 16, 2023) (excessive bail claim moot once petitioner was convicted).  Accordingly, Ground Eleven is dismissed.

### g.    Ground Twelve

In Ground Twelve, Hoerig asserts that the prosecutor engaged in misconduct when he "violate[d] the extradition treaty between Brazil and the United States" in violation of Hoerig's "constitutional rights for 12 years to be tried in Brazil," as provided for by "Articles V, VII, and XI of the Treaty," when he "produc[ed] false affidavits, employ[ed] the media for 12 years, us[ed] political help" and "public money to bribe the [Brazilian] prosecution attorney general" and failed to exercise due diligence" (Doc. No. 14-1 at PageID# 41.)  Hoerig also asserts that the trial court erred and abused its discretion by not addressing these issues as raised in her "pretrial pro se motion and in her habeas corpus."  (*Id.*)

72

The Magistrate Judge recommended that Ground Twelve be dismissed because habeas review of an extradition pursuant to a treaty is limited to a few considerations, none of which Hoerig challenges. (Doc. No. 70 at PageID# 9356.) In particular, Hoerig only contends that the prosecutor provided false information to support extradition and that politicians interfered in the process. (*Id.*) According to the Magistrate Judge, these arguments are beyond the scope of proper habeas review, and even if they were not, Hoerig has still failed to demonstrate that any such false information influenced her extradition proceedings. (*Id.*) Therefore, Hoerig has not demonstrated that she suffered any prejudice when her appellate counsel failed to raise this issue on appeal. (*Id.*)

Hoerig does not raise a specific objection to the Magistrate Judge's conclusion. (*See generally* Doc. No. 82.) Additionally, and notably, Hoerig does not argue or explain how appellate counsel's failure to raise the extradition argument was unreasonable, or that his failure to do so prejudiced her in her trial proceedings. (*See id.*) Hoerig cites the 1969 Human Rights Convention and discusses the alleged bias and bribery of various Brazilian judges and American Congressmen, but neither of these contentions have suggest that appellate counsel should have challenged her extradition proceedings on direct appeal. (*Id.* at PageID# 9863.)

Accordingly, the Court finds that Hoerig has failed to demonstrate that appellate counsel was ineffective for failing to raise this issue on direct appeal. Ground Twelve is dismissed.

### 5. Actual Innocence

With regard to Hoerig's claims that are procedurally defaulted, Hoerig appears to assert that she was actually innocent of aggravated murder, and that she was only guilty of manslaughter. (Doc. No. 82 at PageID#s 9697, 9658, 9831, 9871, 9900.) Hoerig asserts that, because the trial court improperly shifted the burden onto her to demonstrate her innocence of aggravated murder, failed to

require the State to disprove her affirmative defense of sudden passion and manslaughter, and because the prosecutor "shut down" her manslaughter defense during opening arguments and "mentioned the flight distance," she was unable to demonstrate her innocence.  (*Id.*)  The Magistrate Judge does not address any argument of actual innocence or whether the trial court shifted the State's burden onto Hoerig.

If construed as an assertion of actual innocence, Hoerig's argument fails.  Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense.  *Dretke v. Haley*, 541 U.S. 386 (2004).  *See also Schlup v. Delo,* 513 U.S. 298, 327 (1995).  This type of actual innocence claim, sometimes called gateway innocence, "does not by itself provide a basis for relief."  *Schlup*, 513 U.S. at 315.  In other words, the innocence showing is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id*. (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).  Thus, a petitioner's showing of a credible claim of innocence allows him to skirt a procedural defect in his claim so that a federal court may address his allegation of constitutional error.  *Davis v. Bradshaw*, 900 F.3d 315, 326 (6th Cir. 2018).

"But this innocence gateway is a narrow one."  *Davis*, 900 F.3d at 326.  The Supreme Court has cautioned that it "should open only when a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error." *McQuiggin v. Perkins*, 569 U.S. 383, 401 (2013) (citation and internal quotation marks omitted).  Thus, the exception "applies to a severely confined

category: cases in which new evidence shows it is more likely than not that no reasonable juror would have convicted [the petitioner]." *Id*. at 395 (alteration in original) (citation and internal quotation marks omitted); *see Souter v. Jones*, 395 F.3d 577, 590 (6th Cir. 2005).

For a petitioner to establish entitlement to the actual innocence exception, he must support his allegations of constitutional error with new, reliable evidence, such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence, that was not presented at trial. *Id.  See also Davis*, 900 F.3d at 326; *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 427 (6th Cir. 2003).  Absent new evidence of innocence, "even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim."  *Schlup*, 513 U.S. at 316.

In this case, Hoerig does not cite to any specific new, reliable evidence that would demonstrate that she was actually innocent.  As noted above, a petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.  Hoerig has not come forward with any such evidence demonstrating that she is factually innocent, but instead, is relying on the multitude of exhibits she has provided the Court without any specific citation thereto.

Therefore, the Court finds that Hoerig cannot demonstrate that the "actual innocence" exception applies to any of her procedurally defaulted Grounds for Relief.  Accordingly, neither ineffective assistance of appellate counsel nor actual innocence can constitute cause for Hoerig's procedural defaults.

## IV.    Conclusion

For the foregoing reasons, Hoerig's Objections (Doc. No. 82) are overruled.  The Magistrate Judge's R&R (Doc. No. 70) is ADOPTED as set forth herein, and Hoerig's Petition (Doc. No. 1) is DISMISSED.  In addition, Hoerig has not sufficiently demonstrated the need for the appointment of counsel or for expert assistance and her requests for the same are denied.  (Doc. Nos. 2, 3.)  Further, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

**IT IS SO ORDERED.**


      *s/Pamela A. Barker*

PAMELA A. BARKER

Date:  April 19, 2024           U. S. DISTRICT JUDGE